[No. 2,086.]

# THE PEOPLE OF THE STATE OF CALIFORNIA *v.* THE CENTRAL PACIFIC RAILROAD COMPANY OF CALIFORNIA, AND THAT CERTAIN REAL ESTATE SITUATED IN THE COUNTY OF PLACER, AND DESCRIBED AS NINETY-TWO AND ONE FOURTH MILES OF RAILROAD AND TELEGRAPH LINE, SITUATE IN THE COUNTY OF PLACER, AND STATE OF CALIFORNIA, AND KNOWN AS THE CENTRAL PACIFIC RAILROAD AND TELEGRAPH LINE.

STATEMENT ON MOTION FOR A NEW TRIAL.—The specification of reasons why a new trial should be granted, to be made in the statement, is not a general one of errors, in admitting or excluding the evidence, as set forth in the foregoing statement, but a particular specification, and a pointing out and reference to each alleged error.

TAX ON CENTRAL PACIFIC RAILROAD AND TELEGRAPH LINE BY STATE.— The State of California has authority to impose taxation for State purposes upon that portion of the Central Pacific Railroad, and the telegraph line in connection therewith, lying within its limits.

TAXATION BY STATE ON PROPERTY OF CORPORATION.—A railroad corporation, organized under the laws of a State, cannot claim an exemption of its property, lying within the limits of a State, from State taxation, because the corporation thus created has been subsequently adopted by the Federal Government, and is employed in the service of the General Government, in the carriage of mails, munitions of war, etc.

EXEMPTION FROM STATE TAXATION.—The principle upon which the business of a corporation, created by the Federal Government as an agent in the execution of its powers, is exempt from State taxation, does not apply to the real property of the corporation lying within the limits of a State.

UNIFORM OPERATION OF LAWS.—The Constitution of this State does not require laws to have a uniform operation, unless they are of a general nature; and whether a law is of a general or special nature depends, in a measure, upon the legislative purpose discernible in its enactment.

IDEM.—The Constitution does not prohibit a special Act, because the subject with which it deals might have been the subject of a general law.

UNIFORM OPERATION OF TAX LAWS.—A State revenue law is not unconstitutional because there is a want of uniformity between the particular laws prevailing in the several counties, with regard to the enforcement of the payment of delinquent taxes.

REVENUE DISTRICTS AND ASSESSORS OF PROPERTY.—The Legislature is not

prohibited by the Constitution from creating more than one revenue district in a county, and providing for the election of Assessors and Collectors of revenue in each district.

SUIT BY DISTRICT ATTORNEY TO RECOVER DELINQUENT TAXES.—The Constitution of the State allows the Legislature to pass a law directing the District Attorney of a county to bring actions in the name of the people to recover delinquent taxes, and such law does not interfere with the constitutional duties of the Tax Collector.

APPEAL from the District Court of the Fourteenth Judicial District, County of Placer.

The facts are stated in the opinion.

*Robert Robinson* and *Lewis Ramage*, for Appellants, confined their argument to questions arising on the motion for a new trial, which are not passed on in the opinion, as the statement was held defective.

*S. W. Sanderson*, also for Appellants.

The railroad and telegraph line attempted to be taxed in this case have been " established " for postal and military purposes by the General Government, in the exercise of its constitutional powers, and are therefore national works over which the Federal Government has jurisdiction and control, as to all matters affecting their efficiency and use as such. Such being the case, the laws of this State, so far as they authorize the taxation of said railroad and telegraph line for State purposes, are repugnant to the laws of Congress by which said railroad and telegraph line have been " established," and are therefore null and void, as being an unconstitutional interference with the means adopted by Congress for the purpose of carrying into execution certain powers of the General Government.

A brief glance at the provisions of the Act of Congress of the 1st of July, 1862, will suffice to show that the " Union Pacific Railroad Company" is a national corporation, and that the Pacific Railroad and Telegraph Line, so far as they

have been constructed by that company, were intended by Congress to be a national railroad and telegraph line, subject entirely to the legislative management and control of that body, in relation to all matters affecting their use and maintenance for the purposes intended.

The first section names a number of persons, and declares that they, "together with five Commissioners to be appointed by the Secretary of the Interior, and all persons who shall or may be associated with them, and their successors, are hereby created and erected into a body corporate and politic, in deed and in law, by the name, style, and title of the 'Union Pacific Railroad Company.'" The company thus created is vested with the usual and customary powers of a corporation. The corporation is then expressly authorized to construct and maintain a railroad and telegraph line, upon a given line, and between certain points named. The amount of the capital stock is next prescribed, and also certain rules and regulations for the government of the corporation, the management of its affairs, and the transaction of its business. Provision is also made for the election of a Board of Directors, and for the appointment of two additional Directors by the President of the United States, to act as Directors on the part of the Government. The second section grants a right of way through the public lands, with the further right to take from the public lands, adjacent to the line of the road, materials of every description for the construction of the road, concluding with a promise, on the part of the United States, that the Indian titles to all lands falling under the operation of the Act shall be extinguished as rapidly as may be. The third section grants to the company alternate sections of land, on each side of said road, with certain reservations as to mineral lands and lands reserved, or otherwise disposed of, or to which preëmption or homestead claims have attached. The fourth section provides, among other things, for the appointment of three

Commissioners by the President, who are to examine the road, from time to time, and report to him as to the manner of its construction and the progress made therein, with a view to the issuing of patents for said lands, and that all vacancies occurring in said Board of Commissioners shall be filled by the President. The fifth section provides for loaning the credit of the Government, in the shape of bonds, and securing the payment thereof by a first lien upon the road and telegraph, together with all the rolling stock and other property, and concludes with a provision which has a most important bearing upon the question in hand, viz: "And on the refusal or failure of said company to redeem said bonds, or any part of them, when required to do so by the Secretary of the Treasury, in accordance with the provisions of this Act, the said road, with all the rights, functions, immunities, and appurtenances thereunto belonging, and also all lands granted to the said company by the United States, which, at the time of said default, shall remain in the ownership of the said company, may be taken possession of by the Secretary of the Treasury, for the use and benefit of the United States." This provision, so suggestive of the intent of Congress to impart to the road and telegraph line a national character, and place them under the jurisdiction and control of the General Government, is followed by another provision, no less significant of such intent, contained in the sixth section, which provides: "That the grants aforesaid are made upon condition that said company shall pay said bonds at maturity, and shall keep said railroad and telegraph line in repair and use, and shall at all times transmit dispatches over said telegraph line, and transport mails, troops, and munitions of war, supplies and public stores, upon said railroad, for the Government, whenever required to do so by any department thereof, and that the Govern-

ment shall at all times have the preference in the use of the same for all the purposes aforesaid." Power to consolidate with other companies named in the Act is given in the sixteenth section—a power which the sovereign only can confer. The right to connect with the road is given to other companies by the fifteenth section—a condition which the sovereign only can impose. The President is authorized to establish a uniform width of track, so that the same cars can be run from the Missouri River to the Pacific Ocean, by the twelfth section—a condition which the sovereign only can impose. The seventeenth section provides that if said company shall fail to comply with the terms and conditions of the Act, or to keep the road in repair and use for an unreasonable time, " Congress may pass any Act to insure the speedy completion of said road and branches, or put the same in repair and use, and may direct the income of said railroad and telegraph line to be thereafter devoted to the use of the United States," etc.; and further, that if said roads are not completed " so as to form a continuous line from the Missouri River to the navigable waters of the Sacramento River, by the 1st day of July, 1876, said roads, with all their rolling stock, fixtures, etc., shall be forfeited to and be taken possession of by the United States "—all being powers which the sovereign only can exercise. A still further and perhaps more conclusive demonstration of the alleged intent of Congress to exercise complete legislative power over the road, for all the purposes for which its construction was undertaken, is found in the eighteenth section, which deals with the question of fares and the power of Congress to add to, alter, amend, or repeal the Act. It provides that when the net earnings of the road and telegraph shall have reached a certain per centum upon their cost, " Congress may reduce the rates of fare thereon, if unreasonable in amount, and may fix and establish the same by law. And the better to accomplish the object of this Act—

namely, to promote the public interest and welfare, by the construction of said road and telegraph line, and keeping the same in working order, and to secure to the Government, at all times (but particularly in time of war), the use and benefits of the same for postal, military, and other purposes—Congress may at any time, having due regard for the rights of said companies named herein, add to, alter, amend, or repeal this Act." Finally, by the last section, the company is required to make annual reports, as to certain matters therein mentioned, to the Secretary of the Treasury, for the obvious purpose of enabling the General Government to supervise and control the road and telegraph by legislation and otherwise (12 U. S. St. at Large, 489).

This provision in relation to fares has a controlling effect upon the question in hand. The right to regulate tolls is incident to sovereignty. Where the latter does not exist the former does not. Nor can the doctrine of concurrent jurisdiction upon the subject of fares and freights be maintained if advanced. The clause that Congress may regulate them after the profits of the road shall have reached a certain percentage upon the cost, upon familiar principles, is a denial of a right to interfere before that time on the part of either the General or State Governments; and the clause in relation to uniformity is a denial of any right on the part of State Governments to interfere at any time; for if a right to interfere be admitted, the right to adopt any rate they might severally elect is implied. They might, therefore, adopt rates not uniform, and such a result, being in conflict with the declared purpose of Congress, shows that Congress has so far legislated upon the subject as to render repugnant all State legislation. Besides, whenever from any cause, uniformity of rule is demanded, the right to deal with the subject at all is vested exclusively in the General Government. So, by the nature of the subject, as well as the express will of Congress, all State interference is prohibited. (*Cooley* v.

*Board of Wardens,* 12 How. 299; *Gilman* v. *Philadelphia,* 3 Wallace, 713; *Crandall* v. *The State of Nevada,* 6 Wallace, 35.)

The amendatory Acts of July 2d, 1864 (13 U. S. Stats. 356), March 3d, 1865, and June 25th, 1868, are of the same general character. They make some changes, but such changes only serve to confirm the opinion that the intent of Congress was to establish the Pacific Railroad and Telegraph Line as national improvements, for the use of the National Government for postal, military, and other purposes, and generally to promote and subserve the public interest and welfare. As their provisions furnish only cumulative evidence upon the question of Congressional intent, no further reference to them is deemed necessary.

In view of the title of the Act, and the several provisions thereof, to which reference has been made, and the several Acts since passed by Congress upon the same subject, it is submitted that there is no rational ground for doubting the national character of this railroad and telegraph. The purposes of the Act, as declared in its title, and repeated in its body, are national in every sense of the term. The road and telegraph for which provision was made are local in no sense of the term. They were to span more than half the continent, and to constitute a part of a continuous line of communication, stretching through States and Territories, from the Atlantic to the Pacific Ocean. The declared intent was to "promote the public interest and welfare, particularly in time of war," by making them the means of communication and transportation for Government dispatches, mails, troops, supplies, public stores, and munitions of war. No object or purpose could be more national.

In respect to this question, the Pacific Railroad Acts are upon all fours with the Act by which the Bank of the United States was established. (3 U. S. Stats. at Large, 266.) The plan adopted by Congress for the purpose of establishing the

bank and securing its use to the Government, as a financial agent, is so similar to that adopted in the present case, as to suggest that the former served as a model for the latter. As in this instance, a corporation, with full banking powers, was created. The amount of its capital stock was fixed at thirty-five millions of dollars, of which sum the Government was to subscribe only one fifth, or seven millions, leaving twenty-eight millions to be taken by private individuals. The affairs of the bank were to be managed by twenty-five Directors, of whom twenty were to be elected by the stockholders and five to be appointed by the President of the United States, by and with the advice and consent of the Senate. The powers of the Directors and the business operations of the institution were defined and restricted. Power was given, with certain restrictions, to establish branch institutions in the several States. The Secretary of the Treasury was authorized to call upon the bank for a statement of its affairs, as often as once a week. For the privileges and benefits conferred by the charter, the President and Direct ors of the bank were required to pay to the United States a bonus of one million and five hundred thousand dollars, in three equal payments. And it was lastly provided that the books of the corporation should always be open to the inspection of a committee of either House of Congress, appointed for that purpose.

If we look to the objects and purposes of the two Acts, those of the Railroad and Telegraph Act are no less national in their character than those of the bank. If the latter was necessary—that is to say, appropriate to the proper adminis-tration and management of the finances of the Government, the former was no less appropriate or necessary to the proper conduct and management of its postal and military affairs. Each were but means to an end, which was assumed to be within the jurisdiction of the Government to accomplish. If the United States Bank was designed to be a national

institution, subject to the jurisdiction of the General Government, or the legislative will of Congress, it would seem to be incontrovertible that the Union Pacific Railroad and Telegraph Line, if not more so, is certainly not less a national measure, and not less under the control of the National Government. That it was intended so to be, is further apparent from the fact that Congress has no power to create a corporation for any other than national purposes—for any other object than as an instrumentality, or machine, for carrying into effect the powers vested in the General Government. This was decided in the case of *Osborn* v. *The United States Bank*, 9 Wheaton, 738.

The Central Pacific Company, then, is a national corporation.

The Central Pacific was not in the first instance created a corporation by the General Government. It had become a corporation under the laws of this State prior to the passage of the Pacific Railroad Act. I claim, however, that by reason of the Acts of Congress in relation to it, that Congress has recognized its corporate existence, and has adopted it as its agent, and that it has thus become a national corporation, and that this State has released the company from all allegiance to her.

In 1852 the Legislature of this State passed the following Act:

*"An Act to grant the right of way to the United States for railroad purposes.*

"WHEREAS, The interests of this State, as well as the whole Union, require the immediate action of the Government of the United States for the construction of a national thoroughfare connecting the navigable waters of the Atlantic and Pacific Oceans, for the purposes of national safety, in the event of war, and to promote the highest commercial interests of the Republic:

"*The People of the State of California, represented in Senate and Assembly, do enact as follows:*

"SECTION 1. The right of way through this State is hereby granted to the United States for the purpose of constructing a railroad from the Atlantic to the Pacific Ocean." (Stats. 1852, p. 150.)

Again, by the Act of 1862, Congress conferred the same powers upon the Central Pacific which it conferred upon the Union Pacific, annexing thereto the same conditions. In the ninth section of the Act it is provided that:

" The Central Pacific Railroad Company of California, a corporation existing under the laws of the State of California, are hereby authorized to construct a railroad and telegraph line from the Pacific coast, at or near San Francisco, or the navigable waters of the Sacramento, to the eastern boundary of California, upon the terms and conditions, in all respects, as are contained in this Act for the construction of said railroad and telegraph line first mentioned, and to meet and connect with the first mentioned railroad and telegraph line on the eastern boundary of California."

Again, in the tenth section, it is further provided:

"And the Central Pacific Railroad Company of California, after completing its road across the State, is authorized to continue the construction of said railroad and telegraph through the Territories of the United States to the Missouri River, including the branch roads specified in this Act, upon the routes hereinbefore and hereinafter indicated, on the terms and conditions provided in this Act in relation to the said Union Pacific Railroad Company, until said roads shall meet and connect, and the whole of said railroad and branches and telegraph is completed."

So, throughout the Act, and the subsequent Acts, grants and powers are conferred upon the Central Pacific in the same manner, to the same extent, and upon the same conditions upon which they are conferred upon the Union Pacific, thus evincing an intent on the part of Congress to convert the former into a national agent or corporation, and to establish between it and the National Government precisely the relation which was being established between the National Government and the Union Pacific. These Acts, it is submitted, had the effect to convert the Central Pacific into a national corporation, which would continue to exist, even though this State should repeal the laws under which it was first incorporated; and, further, they also had the effect to withdraw the company from the jurisdiction of the State *quoad* all matters affecting the construction, maintenance, and use by the General Government of the railroad and telegraph line.

On the 4th of April, 1864, the Legislature of this State passed the following Act:

" *An Act to aid in carrying out the provisions of the Pacific Railroad and Telegraph Act of Congress, and other matters relating thereto.*

" *The People of the State of California, represented in Senate and Assembly, do enact as follows :*

"SECTION 1. Whereas, by the provisions of an Act of. Congress, entitled ' An Act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the Government the use of the same for postal, military, and other purposes,' approved July 1st, 1862, the Central Pacific Railroad Company of California is authorized to construct a railroad and telegraph in the State of California, and in the Territories lying east of said State towards the Missouri River ; therefore, to

enable said company more fully and completely to comply
with and perform the provisions and conditions of said Act
of Congress, the said company, their successors and assigns,
are hereby authorized and empowered, and the right, power,
and privilege is hereby granted to, conferred upon, and
vested in them, to construct, maintain, and operate the said
railroad and telegraph line, not only in the State of Cali-
fornia, but also in the said Territories lying east of and
between said State and the Missouri River, with such
branches and extensions of said railroad and telegraph line,
or either of them, as said company may deem necessary or
proper, and also the right of way for said railroad and tele-
graph line over any lands belonging to this State, and on,
over, and along any streets, roads, highways, rivers, streams,
water, and watercourses; but the same to be so constructed
as not to obstruct or destroy the passage or navigation of the
same; and also the right to condemn and appropriate to the
use of said company such private property, rights, privi-
leges, and franchises as may be proper, necessary, or con-
venient for the purposes of said railroad and telegraph, the
compensation therefor to be ascertained and paid under and
by special proceeding, as prescribed in the Act providing
for the incorporation of railroad companies, approved May
20th, 1861, and the Acts supplementary and amendatory
thereof; said company to be subject to all the laws of this
State concerning railroad and telegraph lines, except that
messages and property of the United States, of this State,
and of the said company, shall have priority of transporta-
tion and transmission over said line of railroad and telegraph,
hereby confirming to and vesting in said company all the
rights, privileges, franchises, power, and authority conferred
upon, granted to, or vested in, said company by said Act of
Congress; hereby repealing all laws and parts of laws incon-

sistent or in conflict with the provisions of this Act, or the rights and privileges herein granted.

"Sec. 2. This Act shall take effect and be in force from and after its passage." (Stats. 1863–4, p. 471.)

That Congress has the power to create corporations as agents, or instrumentalities, or means of carrying into effect other powers, which are sovereign, whenever such corporations may be regarded by Congress as appropriate means to such an end, has never been seriously doubted since the great cases of *McCullough* v. *The State of Maryland,* 4 Wheaton, 316, and *Osborn* v. *U. S. Bank,* 9 Wheaton, 738. (2 Story on Const., Secs. 1137, 1138, 1139, 1149, 1150.)

If Congress can construct a wagon road for a post road, may it not also construct a railroad for a like purpose? Although all-sufficient for that purpose, the power "to establish Post Offices and post roads" is not the only power to which the authority of Congress to construct and maintain the Pacific Railroad and Telegraph Line may be referred. It may be referred to the power to "provide for the common defense and general welfare of the United States." (*McCullough* v. *The State of Maryland,* 4 Wheaton, 406.)

The question as to what are appropriate means to be used in executing express powers, is a political question to be determined by Congress. (Id.)

A railroad and telegraph line, which extends two thousand miles through several States and Territories, is neither local in site nor in benefit. It requires no argument to show that it is a wise, if not an indispensable provision, for the common defense, or that it is calculated to promote the general welfare of the United States. The power of taxation exists as a concurrent power in the National and in the State Governments. It is an indispensable attribute of sovereignty which each must have the right to exercise, but by reason of the relation which subsists between them, the right of each must

be so exercised as not to interfere with the sovereignty of the other.    (*Weston* v. *The City Council of Charleston*, 2 Peters, 466.)

The above case involved the question whether the City of Charleston could tax six and seven per cent stock of the United States, and it was held that it could not.    Such has continued to be the law of that Court down to the present time.    In the case of *The Bank of Commerce* v. *New York City*, 2 Black. 620, it was held, further, that it made no difference whether the State law taxed the stocks *eo nomine*, or included them in the aggregate of the taxpayer's property, to be valued, like the rest, at its worth on the market, thus showing that no change in mode or form can affect the result. If the result be to cast a burden upon the measures of Congress adopted for the purpose of carrying into effect the powers of the Government, the State law is void.    Again, in the *Bank Tax Case*, 2 Wallace, 200, it was declared that " a tax laid by a State on banks ' on a valuation equal to the amount of their capital stock paid in, or secured to be paid in,' is a tax on the property of the institution, and when that property consists of stocks of the Federal Government, the law levying the tax is void."

Another application of these principles is found in the case of *Dobbins* v. *The Commissioners of Erie County*, 16 Peters, 435.    The plaintiff was a Captain in the United States revenue service, residing in Pennsylvania.    The laws of that State imposed an ad valorem tax on offices, and the question was whether the law, as to offices held under the United States, was not void.    It was declared to be void, the ground of the decision being that it was within the power of the United States Government to fix the compensation to be paid to its officers, and that any law of a State, the effect of which was to diminish the amount of such compensation, conflicted with the law of Congress, and was therefore void.

Suppose the corporations had already failed to perform the

conditions imposed by Congress, and the Secretary had already taken possession of this road and telegraph, who would be sovereign then, the General Government or this State? The right to take possession implies sovereignty no less than possession with such conditions. If the General Government was now in possession, operating the road by officers and engineers employed and paid by it, was now devoting its income to the use and benefit of the United States, is there any one so hardy as to assert that the General Government would have to pay taxes to this State—that the paramount would have to pay tribute to the subordinate? (*Passenger Cases*, 7 How. 283; *Gibbons* v. *Ogden*, 9 Wheaton, 1; *Crandall* v. *The State of Nevada*, 6 Wallace, 35; *Tin Sing* v. *Washburn*, 20 Cal. 534.)

*T. B. McFarland* and *E. L. Craig*, for Respondents.

The position of counsel is that the railroad in question is a national institution, and therefore is exempt from State taxation within the rule of *McCullough* v. *The State of Maryland*, 4 Wheaton, 316.

The Railroad Acts of California and of Congress, cited by counsel and upon which he relies in this part of his case, are private statutes, and should have been both pleaded and proved in the Court below. They are private because they relate to certain individuals, and not to the people at large. (Sedgwick on Stat. and Const. Law, 30, and note.)

If they are private statutes they should have been specially set up as a defense. This is elementary. (*Ellis* v. *Eastman*, 32 Cal. 449.)

Even though not held to be technically private statutes, still, as appellant claims a special privilege under them not accruing to citizens generally, in order to avail itself of that privilege the statutes should have been specially pleaded; and the facts bringing appellant within the statutes relied

on should have been proved on the trial. All these things appear in the record in every case cited by counsel.

But if the Court, overruling our views, should deem it proper to consider these statutes, then we say: first, that appellant is a State corporation, organized by the State of California, subject to its sovereignty, and therefore entirely without the rule of the cases cited by its counsel. It is admitted by counsel that if appellant be a State corporation then the above conclusion follows. And in *McCullough* v. *The State of Maryland*, 429, the Court say:

"The sovereignty of a State extends to everything which exists by its own authority, or is introduced by its permission."

Counsel don't deny, of course, that the appellant was created by the State of California, and exists under her laws. How, then, does he propose to remedy this great defect in his case? Why, he says that Congress has "recognized its corporate existence," and, for certain purposes, "adopted it as its agent," and "thereby" has "converted it into a national corporation." This is virtually saying that to "recognize" or to "employ" is the same as to "create"—a confusion of ideas perfectly bewildering.

We suppose, therefore, according to this doctrine, that if the General Government should employ an incorporated express, or stage, or steamboat company to carry its mails or munitions of war, or to do any business for it whatever, it would thereby immediately "convert it into a national corporation." Is there anything in such a notion that demands a serious answer?

Again: counsel says that the State of California "has released the Central Pacific Railroad Company from all allegiance to her," and in support of this position he quotes in full the Act of this State of April 4th, 1864, which assumes legislative control of the company all the way through it,

and contains, among other things, the following express provision:

" Said company to be subject to all the laws of this State concerning railroad and telegraph lines, except that messages and property of the United States, of this State, and of said company, shall have priority of transportation and transmission over said line of railroad and telegraph." (Stats. 1863–4, p. 471.)

Does this look like a release from " all allegiance " to the State? Is there anything more to be said on the subject?

But if the corporation of the Central Pacific Railroad Company had been expressly created by the General Government, still there is nothing in this case that brings it, in any sense, within the rule of *McCullough* v. *The State of Maryland.*

In the first place, it must be remembered that the tax in the case at bar is not upon the " corporation," or its " franchise," or its " acts," or its " operations," but simply upon its ordinary property, which is taxed in common with all the other property in the State.

Now what was the case of *McCullough* v. *The State of Maryland*, and what did it decide? In that case the Court was dealing with a statute of the State of Maryland aimed directly and specially at the operations of the United States Bank. The Act organizing the bank was passed under great political excitement, and against the most bitter opposition, the controversy turning upon the relative power of the General and State Governments. A branch of the bank was established in Baltimore in 1817. In 1818, at the next meeting of the Legislature of Maryland, an Act was passed to " impose a tax upon all banks " not chartered by the State Legislature, prescribing the manner in which the notes of the bank should be issued and their denominations, and providing that its notes should be issued

upon paper furnished by the State, and that the bank should pay a stamp duty to the State upon every note issued, ranging in amount from ten cents to twenty dollars, unless the bank should pay a large yearly sum in gross for the privilege of doing business. (4 Wheat. 317, 318, 319.) Congress passed the United States Bank Law as a proper measure for the prosecution of its fiscal operations, for the convenient transmission of public moneys, and for the general conduct of the financial department of the Government; the Government itself being the principal stockholder.

Now what did the Court decide? Simply this: First, that the bank was a constitutional measure, lawfully instituted and employed by the General Government for the exercise of its powers; and second, that the Act of Maryland imposed a tax upon the "operations" of this constitutional "measure," and was therefore void.

Throughout the whole opinion Mr. Chief Justice MARSHALL speaks of the tax as directed against a "measure"—an "instrument"—the "means" established by the Government for its own purposes. The whole theory of the case is that the tax was a burden imposed upon the bank itself; upon the corporation; upon its acts; its operations; its business; its very existence; its right to fulfill the purposes for which it was created. It was not a tax upon the ordinary property of the bank, and therefore has no bearing on the case at bar. If the State of California had imposed a stamp duty upon the tickets issued by appellant to its passengers, or a general tax upon the corporation itself, or upon its right to do business, or upon any of its acts or "operations," there would be some slight analogy between the two cases.

At the conclusion of the opinion Mr. Chief Justice MARSHALL gives the whole gist of the case as follows:

" The result is a conviction that the States have no power, by taxation or otherwise, to retard, impede, hinder, or in any

manner control the operations of the constitutional laws. enacted by Congress to carry into execution the powers vested in the General Government."

And, as if seeing half a century ahead, and providing for this present attempt of this appellant to escape the just payment of its taxes under the shadow of the great opinion he was then delivering, he adds the following:

"This opinion does not deprive the States of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank in common with the other real property within the State, nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution in common with other property of the same description throughout the State. But this is a tax upon the operations of the bank, and is, consequently, a tax on the operation of an instrument employed by the Government of the Union to carry its powers into execution. Such a tax must be unconstitutional."

None of the other cases cited by counsel on this point go any further than *McCullough* v. *State of Maryland.* In *Osborn* v. *U. S. Bank,* 9 Wheat. 738, the law of Ohio, as the Court say (p. 868), was more objectionable than the law of Maryland. In this case the State statute imposes a tax upon "all banks" not chartered by the State, and specially provides that the United States Bank, if it should "continue to transact business," shall pay "an annual tax of fifty thousand dollars." The tax was not upon the ordinary property of the bank, but upon the right to "transact business." In *Weston* v. *City Council of Charleston,* 2 Peters, 449, the tax was upon stock issued by the United States Government as evidences of its indebtedness; and the Court held it void because a burden upon the power of the Government to contract and to borrow money. The other cases cited by

counsel in no way alter the principle of *McCullough* v. *Maryland*.

The position of counsel that because the Pacific railroad companies are to transmit and transport dispatches, mails, munitions of war, and other property of the Government over their lines, therefore their railroads, and other property used by them, can't be taxed, for the reason that they are. means used by the General Government within the reason of *McCullough* v. *Maryland*, would apply with equal force to all stage coaches, wagons, steamboats, etc., belonging to other contractors with the Government. But that such property is not subject to the rule as contended for is expressly decided in *Searight* v. *Stokes*, 3 Howard, 151. In this case the United States had granted to the State of Pennsylvania all that portion of the Cumberland road lying within her limits, upon a compact providing, among other things, that "no toll shall be received or collected for the passage of any wagon or carriage laden with the property of the United States, or any cannon or military stores belonging to the United States" (p. 165); and afterwards the State of Pennsylvania passed a law providing "that in all cases of wagons, carriages, stages, or other modes of conveyance, carrying the United States mail, with passengers or goods, such wagon, stage, or other mode of conveyance, shall pay half toll." (Page 166.) The question was as to the validity of the latter law; and counsel for the United States took the position: first, that the law was in violation of the compact above referred to; and, second, that a stage carrying the United States mail is a "means" of the Federal Government to execute its powers within the rule in *McCullough* v. *Maryland*, and, therefore, not subject to State taxation. Upon the first point the Court was divided, the majority holding that the word "property," as used in the

compact, included "mail," and that, therefore, the law was in conflict with the compact. The constitutional question is not much discussed in the opinion of the majority; but Mr. Chief Justice TANEY, who delivers it, says:

"If the State had made this road herself, and had not entered into any compact upon the subject with the United States, she might undoubtedly have erected toll gates thereon; and if the United States afterwards adopted it as a post road, the carriages engaged in their service in transporting the mail, or otherwise, would have been liable to pay the same charges that were imposed by the State on other vehicles of the same kind."

But Mr. Justice McLEAN, who held that "property" did not include the mails, and that the law was not in conflict with the compact, delivers a dissenting opinion, in which he reviews at length the constitutional question, and clearly shows the true meaning of *McCullough* v. *The State of Maryland,* and kindred cases cited by counsel in the case at bar. To the latter part of this opinion, commencing at page one hundred and seventy-nine, we earnestly invite the attention of the Court. It is well known that Mr. Justice McLEAN was a distinguished member of that school of constructionists at the head of which stood the illustrious MARSHALL, who claimed that the Constitution of the United States should be interpreted, not strictly, but rationally. And it will be seen from this opinion that those eminent jurists who went the furthest in enlarging the powers of the Federal Government, never dreamed of carrying the doctrine to the extreme point claimed by the appellant in the case at bar.

But the very questions which we have been discussing have been settled adversely to the views of appellant in the case of *Thompson* v. *The Union Pacific Railroad Company, Eastern Division, et al.,* recently decided by the Supreme

Court of the United States. (Not yet reported, but pub-
lished in the *Sacramento Union* of May 12th, 1870, and other
public newspapers of that date.) In that case, the Union
Pacific Railroad Company, Eastern Division, bore exactly
the same relation to the system of companies which were
subsidized by Congress—and which, together, completed the
overland railroad—that is borne by the appellant in the
case at bar. The company was incorporated by the State of
Kansas, and afterward, like the appellant here, had certain
rights conferred on it by Congress. But the Court say:

"The corporation, however, remained a State corporation,
though entitled to certain benefits and subject to certain
duties under the legislation of Congress."

This is a complete answer to counsel's theory about ap-
pellant being "converted into a national corporation."

The action in the case we are considering was a bill to re-
strain the collection of taxes imposed by the State of Kansas
upon the railroad and telegraph of the company. The com-
plaint alleges, among other things, "that the property of
the company is mortgaged to the United States; that the
company is bound to perform certain duties, and ultimately
to pay five per cent of its net earnings to the United States;
that the company will be greatly hindered and embarrassed
in the performance of its obligations and duties to the United
States if the taxes imposed are collected;" and that the col-
lection of the taxes will be to the "prejudice of the just
rights of the complainants and of the securities of the
United States."

This is precisely the position taken by appellant here, ex-
cept that in the former case the position was taken in the
pleadings in the Court below, while in the case at bar it is
first taken in the brief in the Court above. The reasoning
employed, however, and the authorities cited, are the same
in the two cases. The Court say:

"The main argument for the complainants, however, is that the road, being constructed under the direction and authority of Congress, for the uses and purposes of the United States, and being a part of a system of roads thus constructed, is therefore exempt from taxation under State authority. * * The case of *McCullough* v. *Maryland* is much relied on."

Thus it will be seen that the questions to be decided were exactly those raised in the case at bar. The decision of the Court, which is somewhat lengthy, and covers the whole ground, expressly and pointedly declares that the case is not within the rule of *McCullough* v. *Maryland;* that the latter case only goes to a tax levied by a State upon the "operations" of an instrument "created by the General Government" as a "means" for executing its powers, and does not extend to the case of a corporation enacted by a State, or to the property of any corporation or agent. The Court say:

"We do not think ourselves warranted, therefore, in extending the exemption established by the case of *McCullough* v. *Maryland* beyond its terms. We cannot apply it to the case of a corporation deriving its existence from State law, exercising its franchise under State law, and holding its property within State jurisdiction, and under State protection. * * * We fully recognize the soundness of the doctrine that no State has a 'right to tax the means employed by the Government of the Union for the execution of its powers.' But we think there is a clear distinction between the means employed by the Government. Taxation of the agency is taxation of the means; taxation of the property of the agent is not taxation of the means."

The last sentence above quoted is a concise and exceedingly forcible expression of the principle for which we are contending.

The final result at which the Court arrived is stated as follows:

" We are unable to find in the Constitution any warrant for the exemption from State legislation claimed in behalf of the complainants."

We expressly invite the attention of the Court to this case, as it will be found to be a full determination of all the questions raised in the third brief of counsel for appellant.

By the Court, WALLACE, C. J.:

This action is brought to recover of the railroad company the taxes upon some ninety-two miles of railroad and telegraph line, the property of the company, lying within two of the several revenue districts into which the County of Placer is divided.

The complaint, which is in the form usual in such cases, avers, among other matters, that the railroad company is a corporation duly organized and acting under the laws of the State of California, and is engaged in the business of constructing, operating, and running therein its railroad and telegraph line; that ninety-two and one fourth miles of the road and telegraph line are situated in the County of Placer, and are subject to taxation therein for both State and county purposes; that a tax was duly levied upon all the property in the county subject to taxation—a State tax of one dollar, and a county tax of one dollar and ten cents upon each one hundred dollars worth of property; that there was thereby duly assessed to the railroad company, upon so much of their road and telegraph line as lay within the First Revenue District of the county, upon a valuation of twelve thousand dollars per mile, a State tax of one thousand nine hundred and fifty dollars and a county tax of two thousand one hundred and forty-five dollars; and upon so much of their road

and telegraph line as lay within the Second Revenue District in said county, upon a like valuation per mile, a State tax of nine thousand one hundred and twenty dollars, and a county tax of ten thousand and thirty-two dollars—all which several sums are alleged to be due and unpaid, and judgment is demanded therefor, with the percentage, damages, and costs in such cases provided by statute.

The answer of the company does not deny that it is a corporation deriving its existence from the State laws, but, among other defenses set up, denies the validity of the alleged tax; denies that the valuation really fixed upon the road and telegraph line by the Assessor and Board of Equalization exceeded six thousand dollars per mile thereof, but alleges that there was added to this valuation of six thousand dollars per mile another sum of six thousand dollars per mile, by which the gross valuation of the road and telegraph line purported on its face to have been fixed at twelve thousand dollars per mile, but that this additional six thousand dollars per mile was, in truth, the imposition of a tax upon the value of the business of the company transacted upon the road in the transportation of passengers, freight, etc., and that the Board of Equalization of Placer County, in dealing with the taxation of the road and telegraph line, received and considered certain evidence brought before them as to the mere business done and profit realized by the company in the use of the road and the telegraph line.

A trial was had in the District Court for Placer County, where judgment having been rendered in favor of the people, as prayed for in their complaint, and a motion of the defendant for a new trial having been denied, this appeal is brought from the judgment and the order denying the new trial.

No point can be considered here which is rested upon the refusal of the motion for a new trial. There is found in the record no sufficient specification of the grounds of the mo-

tion, in accordance with the prescribed practice. The statement, as filed and settled, purports, it is true, to set out in the body of it the several proceedings had at the trial—the proffers of evidence, the rulings of the Court, and the exceptions reserved; the only attempted specifications of the grounds of the motion, however, are as follows:

"First—Errors in admitting the evidence offered by plaintiff, as set forth in the foregoing statement, objected to and excepted to at the time.

"Second—Errors in excluding the evidence offered by defendant, as stated in the foregoing statement, and to which refusal and exclusion defendant then and there excepted."

It has been repeatedly determined here that, in support of a motion for a new trial, the specifications of the *particulars* in which the evidence is insufficient, or of the *particular errors of law* upon which the moving party will rely, is indispensable under section one hundred and ninety-five.

The specification required, though found in, and, therefore, in one sense a part of the statement, is nevertheless distinct practically from the statement—it must, of course, be supported by the statement—but it may be and usually is narrower than the statement in its scope. It cannot, indeed, be broader; it cannot point to anything which is not to be found in the statement by which it is supported, but it may, and in practice usually does, omit many matters of alleged error and insufficiency which are to be found in the statement, and which, by thus omitting, it definitively repudiates and abandons. Its office is to select out of the mass of these, and by this selection to preserve such and only such of the matters appearing in the statement itself, upon which it is the purpose of the party to finally rely and insist in support of the motion. It would be unprofitable in this connection to go over the numerous cases in this Court in which this rule has been applied and the statement disre-

garded; it is sufficient to say that in more than one of them the rule referred to was much more nearly complied with than has been done in this case. (*Beans* v. *Emanuelli*, 36 Cal. 117; *Butterfield* v. *C. P. R. R. Co.*, 37 id. 381.) This view disposes of several questions argued by counsel, but there are others made and not depending upon the motion for a new trial, which we proceed to consider.

First—It is claimed that the railroad and telegraph line in question are not subject to taxation under State laws. An elaborate argument has been submitted on the part of the railroad company, in which it is urged that the road and telegraph were established by the Federal Government in the exercise of its constitutional powers " to establish Post Offices and post roads;" " to provide for the common defense and general welfare of the United States;" " to suppress insurrections and repel invasion," and " to raise and support armies." That the taxing power of the State Government, otherwise extending generally to all subjects found within the borders of the State, is to some degree qualified and restrained by the provisions of the Federal Constitution and by Acts of Congress passed in pursuance thereof, is undeniable. The question in this respect has always been, as to the mere degree or extent of the restraint imposed. When the Federal Constitution was before the States for ratification, the question of the respective powers of taxation to be thereafter exercised by the individual States upon the one hand, and the Federal Government upon the other, in the event of the proposed ratification, was a subject of the most anxious consideration. The opponents of the proposed system which was to be established under the Federal Constitution held this language: " Revenue is as requisite to the purposes of the local administration as to those of the Union, and the former are at least of equal importance with the latter, to the happiness of the people. It is, therefore, as necessary that the State Governments should be able to

command the means of supplying their wants as that the National Government should possess the like faculty in respect to the wants of the Union. But an indefinite power of taxation in the *latter* might, and probably would in time, deprive the *former* of the means of providing for their own necessities, and would subject them entirely to the mercy of the National Legislature."

To this objection, Mr. Hamilton, the recognized champion of the proposed new system, and who lent the force of his unrivaled abilities and the weight of his high personal character to its adoption, replied in this language: "Yet I am willing here to allow in its full extent the justness of the reasoning which requires that the individual States should possess an independent and uncontrollable authority to raise their own revenues for the supply of their own wants. And making this concession, I affirm that (with the sole exception of duties on imports and exports) they would under the plan of the Convention retain that authority in the most absolute and unqualified sense; and that any attempt on the part of the National Government to abridge them in the exercise of it, would be a violent assumption of power unwarranted by any article or clause of its Constitution." (Fed. No. 32.)

"Though a law, therefore, laying a tax for the use of the United States, would be supreme in its nature and could not legally be opposed or controlled, yet a law abrogating or preventing the collection of a tax laid by the authority of a State (unless upon imports and exports) would not be the supreme law of the land, but an usurpation of a power not granted by the Constitution." * * * "The inference from the whole is that the individual States would, under the proposed Constitution, retain an independent and uncontrollable authority to raise revenue to any extent of which they

may stand in need by every kind of taxation, except duties on imports and exports." (Fed. No. 33.)

This was the theory upon which the Constitution was ratified, but when it subsequently came to be applied in practice, it was determined in the Supreme Court of the United States that "imports and exports" were not the only subjects which had been withdrawn from the operation of the taxing power of the States. In the case of *McCullough* v. *The State of Maryland*, 4 Wheaton, 316, there was brought in question the validity of an Act of the Legislature of the State imposing a tax upon all banks established and doing business as banks of discount and deposit in that State, without first obtaining a charter from the Legislature. Among the other provisions found in the State law was one which imposed a duty upon all such banks to procure from the State office, by payment of a designated stamp tax, stamped paper of graduated value whereon to issue their notes. The Bank of the United States, chartered in the year 1816, having established one of its branches in the City of Baltimore, an attempt was made to subject its business to taxation under the State law.

The opinion of the Court, delivered by Mr. Chief Justice Marshall, utterly and pointedly repudiated the views we have already referred to as having been enunciated in the *Federalist;* that opinion declared in effect that the State power to tax had been taken away, not only as to "imports and exports," but as to all other subjects constituting the *means* provided by the Federal Government for the exercise of its constitutional powers. It was admitted that this view found no direct support in any particular clause or express provision of the Federal·Constitution. It was, however, declared to result from an asserted principle upon which the Federal Government had itself been founded—the principle of supremacy—and it was said that it was "of the very essence of supremacy to remove all obstacles to its action

within its own sphere," and that this principle (to quote further the language of the Chief Justice) "so entirely pervades the Constitution, is so intermixed with the materials which compose it, so interwoven with its web, so blended with its texture, as to be incapable of being separated from it without rending it into shreds."

The bank being, in the opinion of the Court, a *means* "necessary and proper" to conduct the fiscal operations of the Government, it was accordingly held that its business, though carried on·within the State, was not the subject of taxation by State laws.

Several years subsequently the same question arose before the same Court in the case of *Osborn* v. *The Bank of the United States*, 9 Wheaton, 738. In that case a statute had been passed by the State of Ohio similar in its general scope to that of Maryland, and under its provisions an attempt had been made to enforce the payment by the branch of the United States Bank, located at Chillicothe, of a State tax upon its banking business. The Court reviewed to some extent the position taken in the case of *McCullough* v. *The State of Maryland*. "The whole opinion of the Court" (in that case, said the Chief Justice), "is founded on and sustained by the idea that the bank is an instrument which is 'necessary and proper for carrying into effect the powers vested in the Government of the United States.' It is not an instrument which the Government found ready made and has supposed to be adapted to its purposes; but one which was created in the form in which it now appears for national purposes only." The same general views were subsequently reasserted and applied by the Court in *Weston* v. *The City Council of Charleston*, 2 Peters, 449, in which a municipal tax had been imposed by ordinance of the City of Charleston upon certain loan stock issued by the Federal Government, and also in other cases.

But we are of opinion that the case under consideration

does not fall within the principle announced in any of these cases, for several reasons.

The corporation here was not in the first instance created by the Government of the United States, but by the State; and even if it be conceded that the corporation thus created under State law has been subsequently adopted by the Federal Government, and availed of by that Government as a means of carrying into effect its constitutional powers, such adoption would not, upon the principles adverted to, exempt it from the operation of the State revenue laws. But there is another reason which we think conclusive upon this point, and that is, that the tax in question is not a tax imposed upon the business of the corporation defendant, but only upon its real property situate within the State. The principle upon which mere *means* created by the Federal Government, as agencies in the execution of its powers, are to be exempted from State taxation, has never been applied to the exemption of real property within the State, even when occupied or used exclusively in connection with the business which is itself exempted. Hence, in *McCullough* v. *The State of Maryland*, supra, the Chief Justice observed: " This opinion does not deprive the States of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with the other real property within the State," etc. It is said, however, by the counsel for the railroad corporation, that this was a mere *dictum* of the Chief Justice—that the only question before the Court in that case was as to the authority of the State to tax the *business* of the bank, and that its authority to tax the *real estate* belonging to the bank was not a point in judgment. But the Court having announced a principle, by the application of which the extent of the State authority to impose taxes was to be measured and defined, it of course became necessary to indicate the limits of the operation of that principle—to point out the general

subjects to which it *did not*—as well as those to which it *did* apply. The counsel for the State of Maryland had urged that the principle itself was purely arbitrary, and one which, if sanctioned by the Court, was utterly incapable of limitation. "We have not been told," he said, "whether the banking houses of this corporation, and any other real estate it may acquire for the accommodation of its affairs, are also of this privileged order of property. In principle it must be the same; for the privilege, if it exists, belongs to the corporation, and must cover equally all its property." These views had been urged upon the attention of the Court in the discussion at the bar—a discussion characterized, as the Chief Justice declared, by "a splendor of eloquence and strength of argument seldom, if ever, surpassed." It was in response to this position, and in answer to the reasoning by which it had been supported, that the opinion of the Court undertook to expound and apply the principle which it had asserted; and we think that, when in order to distinctly define the scope of its operation, the Court declared that the principle of exemption *did not extend to real property within the State*, it was the authoritative determination of a question of surpassing importance in itself—one which had been distinctly presented, elaborately argued by counsel, and deliberately considered by the Court.

But whether the case of *McCullough* v. *The State of Maryland* is to be considered as an authoritative adjudication upon this precise point or not, becomes comparatively unimportant, in view of the much later case of *Thomson* v. *Pacific Railroad*, 9 Wallace, 579, determined by the Supreme Court of the United States in the year 1869. In that case, certain stockholders in a railroad corporation filed a bill in the Circuit Court of the United States for the District of Kansas, to enjoin the collection of taxes assessed upon the railroad and telegraph property of the company under the revenue laws of the State of Kansas. It was there distinctly claimed

that the principle of exemption from State taxation was applicable to that property—and this was the principal issue, indeed the sole question presented. The argument by which the claim was supported was much the same in its general scope as that submitted for our consideration. The Court was, however, unanimously of the opinion that such a claim was without support. After a review of the authorities, it expressed its views as follows: "But we are not aware of any case in which the real estate or other property of a corporation not organized under an Act of Congress has been held to be exempt, in the absence of express legislation to that effect, to just contribution, in common with other property, to the general expenditure for the common benefit, because of the employment of the corporation in the service of the Government." Further, speaking of the principle upon which such exemption is rested, it said: "We cannot apply it to the case of a corporation deriving its existence from State law, and holding its property within State jurisdiction and under State protection."

We have not overlooked the argument of the counsel for the defendant here, in which it is asserted that there is a distinction to be taken between the case of *Thomson* v. *Pacific Railroad* and the one now under consideration. It is said that in the former case it was admitted in the pleadings that the corporation was "a local or State corporation," but we have already had occasion to observe that it is also admitted by the pleadings in this case "that the said defendant, the Central Pacific Railroad Company of California, is a corporation duly organized and acting under the laws of the State of California." In this respect, therefore, the two cases are substantially identical. It is also urged that in the former case "there had been no legislation on the part of Kansas by which that State could be said to have relinquished any of its sovereign rights over the railroad company;" while it is insisted that upon the part of the State of

California such laws have been enacted as amount to a renunciation of State power in the premises. Without pausing at this point to consider whether under our constitutional system of government it is or would be competent to either the State or Federal Government to abdicate in favor of the other its rightful authority, constitutionally vested in it, over such a subject as this, so as to destroy the uniformity of the relations existing between the several States upon the one hand and the Federal Government upon the other, we are of opinion that there is nothing to be found in the legislative enactments of this State which imports a renunciation upon its part of the sovereign power of taxation over the railroad and telegraph line in question. On the contrary, we find that in the statute of April 4th, 1864 (Stats. 1863–4, p. 471), enacted for the purpose of enabling the railroad company to comply with and perform the provisions and conditions of the Act of Congress of July 1st, 1862, it is distinctly provided as follows: "Said company to be subject to all the laws of this State concerning railroad and telegraph lines, except that messages and property of the United States, of this State, and of the said company, shall have priority of transportation and transmission over said line of railroad and telegraph." The exception points out, and was obviously intended to point out, the *only particulars* in which the assent of the State there accorded to the provisions of the Act of Congress should change in any respect the conditions theretofore existing between the railroad corporation upon the one hand and the State of California upon the other, and the liability to State taxation was not one of these. For these and many other reasons which we need not here stop to enumerate, we are of opinion that the authority of the State to impose taxation upon the railroad and telegraph line, in common with all other subjects of taxation within its limits, is clear and unquestionable, and

the objection of the defendant in that respect must be overruled.

Second—It is next objected that the revenue laws of the State are unconstitutional—null and void—as not being uniform in their operation, and in this connection Article I, Section 11, of the State Constitution is cited in the following words: "All laws of a general nature shall have a uniform operation."

It is not denied that the mere taxation imposed by the revenue laws is equal and uniform, nor is it pretended that property is taxed otherwise than in proportion to its value; but it is said that although these cardinal constitutional rules are observed in the structure of the revenue laws of the State, yet there is a want of uniformity between the particular laws prevailing in several localities of the State in respect to the enforcement of the payment of *delinquent* taxes; that in some counties this payment is enforced by means of a levy upon the property of the delinquent, and a sale thereof made by the Tax Collector to the bidder who will pay the tax for the least amount of property, while in other counties an action at law, judgment, execution, and Sheriff's sale are resorted to; that where the sale is made by the Sheriff, under judgments rendered, the deed delivered to the purchaser is conclusive, while in case the sale be made by the Tax Collector, it is only *prima facie* evidence of title, etc.

That the legislative power is restrained only by the limitations of the Constitution, clearly imposed upon its exercise, and that a statute enacted is not to be put aside by the Courts, unless its conflict with the fundamental law be manifest, are the rules of familiar application. The deference we owe to the legislative will is only second to that which we owe to the commands of the Constitution, which both the Legislature and the Court are sworn to obey.

The particular section of the Constitution supposed to

have been infringed by the Revenue Law in force in the County of Placer concerns "*laws, of a general nature,*" and declares that *such* laws shall have a *uniform operation.* /The Constitution, it will be observed, has not undertaken to declare that *all* laws shall have a uniform operation—uniformity in that respect is made requisite only in case the law itself be one of a *general nature*, and if it do not purport to be such an one, no objection as to uniformity or want of uniformity in its operation can be interposed. The *nature* of a given statute as being general or special must depend in a measure upon the legislative purpose discernible in its enactment. We are not to say that a statute, plainly special in its scope, must either have a uniform operation or not operate at all—for this were to add another to the limitations which the Constitution has imposed upon the legislative power, and to hold in effect that no special Act could be passed at all—at least if "uniform" operation means *universal* operation, as the argument of the defendant's counsel would apparently maintain. Nor are we to say that a special statute—special in its *aim* and in the object it has in view, is by mere construction to be converted into a general statute, because the subject with which it deals *might* have been made the subject of a general law. It is obvious that every law upon a *general subject* is not *per se*, nor by constitutional intendment, necessarily a law of a general nature. The subject may be general, but the law and the rule it prescribes may be special. Fees of office, for instance, constitute a general subject—one which pervades the length and breadth of the State, and extends into every political subdivision of which it is composed—yet a statute may prescribe what these fees of office shall be in a particular county, and may declare that they shall differ from fees established for the same official duties performed in another county. Such a law would

not be a law of a general nature, involving the constitutional necessity of uniform operation, but it would be a special law upon a general subject, and at an early period in our judicial history the constitutionality of such a statute was unhesitatingly sustained by this Court./ (*Ryan* v. *Johnson*, 5 Cal. 85.) The legislation of the State has since then proceeded upon the assumed correctness of the construction given to the Constitution in that case. The views there announced have never since then been seriously questioned by any case in this Court to which our attention has been called, and as an exposition of the clause of the Constitution under consideration, in point of time almost contemporaneous with the adoption of the Constitution itself, and, ever since its enunciation, observed and followed in the legislative proceedings of the State, it must be considered as conclusive · upon the point of constitutional law involved in this objection.

Third—It is claimed that the tax in question was illegally assessed, because not assessed by a County Assessor for Placer County—the point being that the record shows that the assessment of a portion of this road and telegraph line was made in Revenue District Number One, by the Assessor of that district, and the assessment of the remainder of the road and telegraph line in Placer County was made in Revenue District Number Two, by the Assessor of that district. It is argued that such an officer as a *District Assessor*—at least of a district less in its territorial extent than an entire county—is unknown to the Constitution. That instrument (Art. II, Sec. 13,) provides as follows: " Section 13. Taxation shall be equal and uniform throughout the State. All property in this State shall be taxed in proportion to its value, to be ascertained as directed by law; but Assessors and Collectors of town, county, and State taxes shall be elected by the qualified electors of the district, county, or town in which the property taxed for State, county, or town purposes is situated." It is obvious that

the "*district*" for which an Assessor is to be chosen is not necessarily coterminous with the boundaries of a single county, for a county being also named in the clause, the expression would become thereby merely tautological, and, so far, without the precision which is to be looked for in every word of the organic law. A *county* is one territorial division, expressly recognized by the Constitution for revenue purposes, in the clause already cited; a *district* is another, and these were obviously not intended to designate the same or an identical extent of territory. Obviously, then, a revenue district may be less in extent than a county, of which it is a part. There is nothing in the Constitution which expressly forbids it to be so, or presents a substantial difficulty in that construction of its several provisions.

Fourth—The fourth and last objection to be noticed is also rested upon section thirteen, Article II, of the Constitution, already recited. It is argued that the statute authorizing an action to be brought by the District Attorney, for the collection of taxes, is not warranted by this section of the Constitution—that if such an action is to be brought at all it must be brought by the Tax Collector. The action is brought not by the Tax Collector, nor by the District Attorney, but by the people of the State of California, and is conducted by their District Attorney for the County of Placer. The money sued for is claimed by the people as due to them for taxes delinquent and owing by the defendant to them. The office of District Attorney is one created by the Constitution (Art. VI, Sec. 11); and the Legislature is therein required to fix by law his duties and his compensation. By the Act of April 29th, 1851 (Hitt. General Laws, Sec. 2402), it is made the general duty of that officer to prosecute actions accruing to the State or his county; and by the Act of May 17th, 1861 (Hitt. General Laws, Sec. 6188), it is especially made his duty to commence actions in the name of the people of the State of California for the

recovery of delinquent taxes. This legislation is directly
authorized by section eleven, Article VI, of the Constitution,
already referred to. It is the duty of the Tax Collector to
receive taxes from those offering to pay them; and the law
might have made it his duty to take steps to enforce their
collection when delinquent, but it has not done so in this
instance, but has assigned that duty to the District Attorney;
and we do not find in the Constitution that where the tax-
payer has neglected and refused to pay the taxes, though
due, the Legislature may not authorize judicial proceedings
to be instituted, and may not, in case of such proceedings,
direct the proper District Attorney to conduct them as other
judicial proceedings in which the people are the party in
interest. The right to bring the suit at all imports the duty
to provide for its conduct by some officer or person com-
petent for the discharge of that duty; and even if it be
conceded that it is the general duty of the Collector to
receive the taxes when offered by the taxpayer, and that it
is not competent to the Legislature to authorize any other
officer to perform that general duty, unless it first make
such officer ex officio Tax Collector, we apprehend that
when the Tax Collector has been defeated in the perform-
ance of that duty by the persistent refusal of the taxpayer,
and has made his official return to that effect, his legal
duties as Tax Collector may be said to have so far come to
an end, and been discharged by him, as that judicial pro-
ceedings may be instituted to recover of the delinquent a
sum of money equal to the delinquent tax, together with
damages, percentage, costs, etc.

We see nothing in this course, if pursued, which would
amount to an interference with what is claimed to be the
constitutional duties of the Tax Collector, or a disturbance
of any discernible scheme of county government to be found
in the Constitution.

The judgment and order denying a new trial must, there-fore, be affirmed; and it is so ordered.

[The defendant made application to the Chief Justice, under the provisions of the Federal Judiciary Act, for the allowance of a writ of error in this case, but the Chief Justice denied the application. The writ was, however, afterwards allowed by one of the Associate Justices of the Supreme Court of the United States; and the record having been returned into that Court, and the cause argued and submitted there, the writ of error was dismissed upon the application of the plaintiff in error.—REPORTER.]