Boynton, J.
I. The rule is clearly settled by the eases cited below, that the disqualification of a juror sitting at the trial of a cause, either civil or criminal, which the exercise of due diligence would have disclosed, is not a sufficient ground *236 for setting aside the verdict and granting a new trial. Haywood v. Calhoon, 2 Ohio St. 164; Eastman v. Wright, 4 Ohio St. 156; Parker v. The State, Id. 234; Kenrick v. Reppard, 23 Ohio St. 33; Watts v. Ruth, 30 Ohio St. 32. The party moving for a new trial on such ground must show that he exercised such care and diligence before the juror was sworn, or he will he held to have waived all objections to his competency, which the employment of reasonable diligence would have shown to be well founded. But where such diligence is shown to have been used, or, if used, would not have resulted in disclosing the disqualification, no waiver can be implied. A majority of the court are unwilling to hold, especially in a case involving life, that the accused, by neglecting to inquire of the juror whether he was the person by that name summoned, was so far guilty of negligence as to estop or prevent him from taking advantage of the juror’s disqualification after the trial.
The statute (74 Ohio L. 345, § 7) requires a copy of the panel of the jury returned by the sheriff to be delivered to the accused at least three days before the day of trial. This requirement was complied with in the present case. The plaintiff was, therefore, apprised that one Eli Stephenson was one of the regular jurors summoned for his trial; and when such juror was called, a person by that name appearing and answering thereto, we think he might well assume such person to be the regular juror. If the person so appearing had borne another name, and had personated the absent juror, this clearly, under the authorities, would have been ground for a new trial, if the fact of such personation was unknown to the accused in time to correct the error before he was prejudiced thereby. The People v. Ransom, 7 Wend. 417 ; Norman v. Beaumont, Willes, 484; Dovey v. Hobson, 6 Taunt. 400 ; The Queen v. Sulivan, 8 Adol. & Ellis, 831; King v. Tremearne, 5 B. & C. 254; 1 A. L. Reg. 424. See Hill v. Yates, 12 East. 229.
Yet no one can doubt that the identity of the two names was calculated to disarm vigilance, and render the deception more successful and complete. Therefore, to impute a want *237 of diligence, under the circumstances, to the r. ccused or his counsel, in not ascertaining before the trial that the sitting juror was not the one summoned, or to hold him to have waived all objection to the juror’s competency, would be to exact a higher degree of care and caution than the law requires.
The irregularity being such as materially to affect a substantial right of the accused, and by which he was prevented from being tried by a legally constituted jury, the verdict should have been set aside and a new trial granted. Cantwell v. The State, 18 Ohio St. 477.
II. A question of more importance and difficulty arises upon the exception of the plaintiff to the order overruling his challenge to the array of the jury. This question involves the constitutionality of the act under which such jury was-selected and summoned; and, as the case goes back for retrial, its determination becomes necessary. The question is not without its difficulty, and has received from the court the consideration its importance demands.
The county of Cuyahoga is the only one in the state having, at the last federal census, a population exceeding one hundred thousand and not exceeding two hundred thousand inhabitants, and, therefore, is the only county in the state to which the provisions of said act apply. Hence,, there is no doubt, that if the act thus restricted in its operation is a law of a general nature, within the meaning of the constitution, it is void for’want of conformity to section 26, article 2, which requires that “ all laws of a geiieral nature shall have a uniform operation throughout the state.” The principal difference between the act, the validity of which is drawn in question, and the more general act of 1873, relating to jui’ies, is, that by the former the selection of the body of men from which the jury is to be drawn is made by the clerk of the court of common pleas, the county auditor, and treasurer, from the qualified electors of townships and city wards, while under the latter the selection is made by the township trustees, from the qualified electors of townships.
*238 The term “law of a general nature,” as employed in the ■constitution, has not, as yet, received from this court an .authoritative definition, and none will be attempted in the present ease. The annunciation of the principles that gov•ern each case as it arises is the better mode of arriving at its proper meaning and effect. Davidson v. New Orleans, 96 U. S. 97.
In Cass v. Dillion, 2 Ohio St., 617, Thurman, J., commenting on the section in which the clause is found, said: “ The origin of this section is perfectly well known. The legislature had often made it a crime to do in one county, •or even township, what it was perfectly lawful to do elsewhere; and had provided that acts, even for the punishment of offenses, should be in force, or not, in certain lo•calities as the electors thereof, respectively, might decide. It was to remedy this evil and prevent its recurrence that this section was framed.” By reference to the debates upon this clause of the constitution, in the convention that framed that instrument (2 Yol. 225), it will be seen that the legislation complained of, and against which it was .■sought to guard the future, was of a character concerning the general nature of which there could be little doubt. A .general law, that land should not be sold upon execution for less than two-thirds of its appraised value was excluded from operation in several counties by local enactment. There were different laws in different counties respecting the descent and distribution of intestate property. Some statutes defining legal offenses were excluded in their operation from a large part of the state; and different penalties for a violation of the same act, were, in some instances, provided for different localities. These -are examples of the legislation, to prevent which in the future, and the mis-chief resulting from it, this provision of the constitution was adopted. But no wider scope was claimed for it -than to guard the future against the evils and inequalities resulting from legislation of the character complained of; and that legislation, in every instance mentioned, consisted either in conferring privileges and immunities upon some, *239 that were denied to others, or in imposing burdens upon •some, from which others, in like situations, were exempt. That it was not intended to withhold from the legislature the power to provide necessary local and special laws to meet the wants of particular localities is evident from a consideration of those provisions which lay special restrictions upon the power to pass local or special laws in certain •specified cases.
The legislature may pass no special act conferring corporate powers. Art. 13, § 1. Section 28, art. 2, confers power, by general law's, to authorize courts to carry into •effect, upon such terms as shall be just and equitable, the manifest intention of parties and officers, by curing omissions, defects, and errors in instruments and proceedings, arising out of their want of conformity with the laws of this state. The legislature may, by general laws, exempt from taxation personal property, to an amount not exceeding two hundred dollars for each individual. Art. 12, § 2. The general assembly shall provide for the organization of cities and incorporated villages, by general laws, and restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to pi event the abuse of such power. Art. 13, § 6. These provisions give rise to a clear and plain implication, that it was not the design of the framers of the constitution, or of the people in adopting it, to withhold the power to provide such local or special laws as the public necessities might require. The clause of the constitution requiring.a uniform operation to be given to laws of a general nature was confessedly taken from the constitution of California. See 2 •Const. Debates, 227. It first found a place in the bill of rights of the constitution of Iowa, associated with language which excluded all doubt of its proper meaning, as there used. The language of the clause, in the California constitution, is as follows : “ All laws of a general nature shall have a uniform operation.” Section 6, art. 1, of the Iowa •constitution is in the following language: “ All laws of a general nature shall have a uniform operation ; the general *240 assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens.”
The provision in the constitution of California has been repeatedly before the supreme court of that state, and its meaning clearly defined. In Smith v. The Judge of the Twelfth Judicial District, 17 Cal. 554, it was said, by Baldwin, J., in speaking of this provision: “The language must be carefully noted. It is not that laws shall be universal, or general in their application to the same subject, nor is it even that all laws of a general nature shall be universal or general in their application to such subjects, but the expression is, that these laws of a general nature shall be uniform in their operation; that is, that such laws shall bear equally in their burdens and benefits upon persons standing in the same category.”
And by Sanderson, J., in Brooke v. Hyde, 37 Cal. 375, it was further said : “ By uniform operation, I understand, as was said in French v. Teschemaker, 24 Cal. 544, an operation which is equal in its effect upon all persons or things upon which the law is designed to operate at all. The difficulty is in determining the precise definition of a general lawn All law's operate upon persons or things. Are we, then, to understand that a general law is one that operates upon all persous or upon all things? If so, it is obvious ■that our general laws are very few', if, indeed, there are any of that class.”
And it was there held that the provision means “that every law' shall have a uniform operation upon the citizeus, or persons, or things of any class, upon whom or which it purports to take effect, and that it shall not grant to any citi■zeu, or class of citizens privileges, which, upon the same ‘terms, shall not equally belong to all citizens.” This holding was founded on the reasoning, that the provision of the constitution of that state, having been taken from the ‘constitution of Iow'a, and the term being clearly defined ‘by the latter clause of the Iowa section, the convention ‘that • borrow'ed it must be presumed to have borrowed *241 its meaning, and designed that it should establish the same rule of legislative action, which, by express definition, it is made to establish in the constitution from which it was taken.
In the subsequent case of The People v. C. & P. R. R. Co., 43 Cal. 432, the court say: “ The constitution, it will be observed, has not undertaken to declare that all laws shall have a uniform operation. Uniformity, in that respect, is made requisite only in case the law7 itself be one of a general nature, and if it do not purport to be such a. one, no objection as to uniformity, or want of uniformity, in its operation, can be interposed. The nature of a given statute, as being general or special, must depend, in a measure, upon the legislative purpose diseernable in its enactment. We are not to say that a statute, plainly special in its scope, must either have a uniform operation or not-operate at all; for this were to add another to the limitations which the constitution has imposed upon the legislative power, and to hold, in effect, that no special act could be passed at all — at least if ‘uniform’ operation means universal operation, as the argument of the defendant’s counsel would apparently maintain.
“ Nor are we to say that a special statute — special in its-aim and in the object it has in view — is, by mere construction, to be converted into a general statute, because the subject with which it deals might have been made the subject of a general law. It is obvious that every law upon a genereil subject is not, per se, nor by constitutional intendment, necessarily a law of a general nature. The subject may be general, but the law and the rule it prescribes may be special. Fees of officers, for instance, constitute a general subject — one which pervades the length and breadth of the state, and extends into every political subdivision of 'which it is composed — yet a statute may prescribe what these fees of office shall be in a particular county, and may declare that they shall differ from fees established for the same office as duties performed in another county. *242 ■Such a law would, not be a law of a general nature, involving the constitutional necessity of uniform operation ; but it would be a special law upon a general subject. And, .at an early period in our judicial history, the constitutionality of such a statute was unhesitatingly sustained by this •court. Ryan v. Johnson, 5 Cal. 85.”
The provision above quoted from the constitution of Iowa, in conjunction with section 30, article 3, prohibiting the passage of local or special laws, in certain cases, has been before -the supreme court of that state in several instances. The section relating to the passage of local or special laws is as follows: “ The general assembly shall not pass local or .special laws in the following cases: For the assessment or collection of taxes for state, county, or road purposes; for •carrying out, opening, or working roads and highways; ¡for changing the names of persons; for the incorporation of cities and towns; for vacating wards, town-plats, streets, .alleys, or public squares; for locating or changing any ■ county seats. In all the cases above enumerated, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the state. . . .”
Here, it will be observed, is a substantial requirement ■that all laws shall be general and of uniform operation throughout the state, in all cases where, from the nature or •character of the act, or its subject-matter, it can be made general.
In McAunich v. The M. & M. R. R. Co., 20 Iowa, 338, it, however, was held, that the number of citizens affected by a law did not control its validity under section 6, article 1, and .section 30, article 3 of the constitution. The statute, the validity of which was assailed as being in conflict with the ■constitution, provided, that “ every railroad company shall be liable for all damages sustained by any person, including •employes of the company, in consequence of any neglect -of the agents, or by any mismanagement of the engineer or other employes of the corporation, to any person sustaining such damage.” To the objection that the statute was *243 -unconstitutional because it was limited in its operation to railroad companies, and subjected them to a rule, or liability, -from which other persons, both natural and artificial, were ■exempt, the court said: “ These laws are general and uniform, not because they operate upon every person in the state, for they do not, but because every person who is brought within the relation and circumstances provided for -is affected by the law. They are general and uniform in -their operation upon all persons in the like situation, and the fact of their being general and uniform is not affected by the number of persons within the scope of their "operadion.” See also U. S. Express Co. v. Ellyson, 28 Iowa, 370.
Haskel v. The City of Burlington, 30 Iowa, 232, involved the •constitutionality of an act providing, in substance, that all -cities and towns theretofore incorporated under special acts •and charters, and which did not then possess the power to •sell personal and real property for the collection of delinquent taxes, should thereafter have and possess such power. It was urged that this was a special or local law in its effect .and operation, because it did not apply to all cities and downs in the state. But the court held it was not unconstitudional, and declared its true construction to be, that, “ operating upon a particular condition, and attaching to it cerdain consequences, whenever that condition existed, the •consequences would follow. That, applying to all cities in the state falling within the class specified, it was not local or special, but of uniform operation.” To the same effect is The Iowa Lund Co. v. Soper, 39 Iowa, 112.
In C. B. & Q. R. R. Co. v. Iowa, 94 U. S. 155, it was held hy the Supreme Court of the United States, that an act of dhe Iowa legislature, which divided the railroads of the state into classes according to business, and established a maximum of rates for the transportation of freight and passengers on the different roads for each of said classes, was not in conflict with the provision of the constitution requiring the uniform operation of laws of a general nature; nor with the provision declaring that the “ general assembly shall *244 not grant to any citizen or class of citizens privileges or immunities which, upon the same terms, shall notequallybclongto all citizens.” "Waite, C. J., remarking upon the act, said: “ It operates uniformly on each class, and this is all the constitution requires. ... It is very clear that a uniform rate of charges for all railroad companies in the state might operate unjustly upon some. It was proper, therefore, to provide, in some way, for an adaptation of the rates to the circumstances of the different roads; and the general assembly, in the exercise of its legislative discretion, has seen fit to do this by a system of classification.”
The Kansas constitution provides, that “all laws of a-general nature shall have a uniform operation throughout the state, and, in all cases where a general law can be made applicable, no special law shall be enacted.” § 17, art. 2.
In Darling v. Rogers, 7 Kan. 592, it was held, that an act declaring what should constitute a legal and sufficient fence, and requiring all fields and inclosures to be inclosed therewith, was a law of a general nature, and that a statute subsequently enacted, exempting certain counties from its operaiiou, was in conflict’with the foregoing provision of the constitution. And in Robison v. Perry, 17 Kan. 248, it was held that an act of the legislature prohibiting sheep from running at large in all counties of the state except one, was obnoxious to the same provision of the constitution, and, consequently, void. These cases seem in full accord with the principle of the California cases, as the statute exempting persons or citizens in the excepted counties from the duty of inclosing their fields with fences in the one case, and of restraining their sheep from running at large in the other, conferred privileges and accorded benefits not extended to those of the same class in other parts of 'the state.
The reference thus made to the decisions of other states, and the citations therefrom, are not for the purpose of approving all that may have been said or held by the courts pronouncing such decisions, but rather to show their tendency on questions of a kindred nature to the one involved in the present controversy, and the strictness with which *245 ■courts uniformly adhere to the rule requiring the validity ■of a statute to be upheld and sustained, unless its repugnancy to the constitution appears beyond a reasonable doubt. Lehman v. McBride, 15 Ohio St. 591; Wellington v. Petitioners, 16 Pick. 87.
The difficulty encountered in all cases where a legislative act is alleged to contravene the provision requiring the uniform operation of laws of a general nature, lies in determining what constitutes a law of that nature, within the meaning of the constitution. The test is said to depend upon the character of its subject-matter; that if that is of a general as distinguished from a local or special nature, existing in every county throughout the state, subject in which all the citizens have a common interest, then the law is one of a general nature, requiring a uniform operation throughout the state.
This is the ground on which it is contended that the statute in the present ease is unconstitutional. That is, that the selection of jurors for the trial of causes in the court of common pleas, and the designation of the persons, or body of persons who are charged with the duty of making such selection, are so far subjects of a general nature, existing throughout the state, as to require the power .to'make such selection to be conferred on the same class of men, or public officers, in every county of the state.
This position derives some support from whar was said in Kelly v. The State, 6 Ohio St. 269. But subsequent decisions of this court, and in which the learned judge delivering the opinion in that case concurred, show,that the proposition that a law relating to or concerning a general subject-matter is a law of a general nature, is not to be taken, in an unqualified sense, to be true. That a law of a general nature must concern a subject-matter, existing, and capa,ble of uniform operation, throughout the state, can not be denied; for, if the law, from the nathre of its subject-matter, is not susceptible of an operation throughout the state, it can not, within the meaning of the constitution, be a law of a general nature. But it by no means follows that all *246 laws pertaining to a general subject-matter, and susceptible of a uniform operation throughout the state, are laws of a general nature in the constitutional sense of that term.
Iu The State ex rel. v. The Judges of the First Judicial District, 21 Ohio St. 1, it was held that an act limiting and regulating the fees of the county officers of Hamilton county ■was not a law of a general, but of a local nature. And in Cass v. Dillon it was said that a law authorizing and requiring the commissioners to subscribe on behalf of the county, to the stock of a railroad company, was no more of' a general nature, than would be an act to authorize the construction of a bridge or the erection of a poor-house. And yet it is ] erfectly clear, that an act regulating the fees of county officers throughout the state, pertains to a general subject-matter, existing in every county, and iu which all citizens have an interest, as do the general acts authorizing-county commissioners to construct bridges, erect poorhouses, and other necessary public buildings.
And yet who would venture to question the power of the-legislature to clothe the commissioners of a county, or the-trustees of a township, by local enactment, with authority to-provide all public buildings or structures that the local wants-of the community might require; or who will contend that the power of the legislature is so circumscribed and restricted as to prohibit it from requiring a tax to be levied, or a court-house to be erected in one county, without requiring the same thing to be done in every county of the state ?
The act authorizing the judges of the court of common pleas to fix the times for holding the terms of court in their respective districts is a general law, the subject-matter of which exists, and concerns all the people throughout the state. Can not the legislature change, by local enactment, the term of a court so fixed ? If it may do so, it is because-the act authorizing the judges to fix the time for holding-the courts, although general in its terms, and relating to a subject-matter that pervades all parts of the state, is not, within the meaning or intendment of the constitution, a law of a general" nature.
*247 Such laws are clearly distinguishable in their nature from those that confer privileges and immunities, or impose burdens upon a citizen or class of citizens, that are not upon the same terms and conditions conferred or imposed on all. It is easy to comprehend that a law defining burglary or bigamy, and its penalty, or regulating descent and distribution, or prescribing the capacity requisite for the testamentary disposition of property, regulating conveyances, or prescribing a rate of interest for the use of money, and others of similar effect and operation, are laws of a general nature, requiring a uniform operation throughout the state. To discriminate between localities or citizens in the enactment of laws of such a nature would be to grant privileges or impose burdens of a character which it was the clear purpose of the constitution to provide against. But that a law may be general and concern matters purely local or special in their nature, or may be local or special, and relate to a matter that may be made the subject of a general law, not only rests upon sound reason, but is well supported by authority. In several of the states, some of whose constitutional provisions require laws of a general nature to have a uniform operation throughout the state, there are express constitutional requirements, that general laws shall be made in all cases where they can be made applicable, and that in such cases local or special laws shall not be enacted. And in nearly all of such states, the holding is uniform and to the effect, that it is within the discretion of the law-making power to determine whether a general law can be made applicable or not, and that its judgment in the premises is final and conclusive. Gentile v. The State, 29 Ind. 409; The State v. Tucker, 46 Ind. 315; The State v. County Court of Boone County, 50 Mo. 317; The Board of Commissioners v. Shields, 62 Mo. 247 ; The State ex rel. v. Hitchcock, 1 Kans. 178; Beach v. Leachy, 11 Kans. 23.
In the case last cited, a special act authorizing a certain school district to issue bonds to raise money to build a school-house, was held not in conflict with the provision requiring a general law to be made in all cases where it could *248 •bo made applicable, the court saying, that “the provision .of the constitution was not to be literally and strictly construed, and that the mere fact that certain results could be . accomplished by a general law did not necessarily avoid a special law passed to effect them.”
And The State v. The County Court of New Madrid, 51 Mo. 83, announcing the same doctrine, held that an act authorizing the county courts of certain counties which were named in the act, to levy a special tax to -pay the debts of said counties, was not in conflict with the constitutional provision forbidding the general assembly to pass any special law for any case for which provision could be made .by general law.
The cases denying it tó be a question for the legislature to determine whether an act can be made general or not, .are Ex parte Pritz, 9 Iowa, 33, and Clark v. Irwin, 5 Nev. 124; both of which cite and seem to rest upon Thomas v. The Board of Comm’rs, 5 Ind. 4, a case directly overruled by Gentile v. The State, above cited.
Nowq if a law of a general nature embraces, per se, all whose subject-matter is general, why this extra provision in those states where laws of a general nature are required to, have a uniform operation throughout the state ? If there is no distinction between a general law and a law of a general nature; in other words, if laws of a general nature include all those that relate to matters and things ■that may be made the subject of a general lawr, it follows that the special provision requiring the enactment of a .general law, iu all cases where the same can be made applicable, would result, as respects some legislation at least, in having two constitutional provisions to accomplish the same object. It is very manifest that no such result was •intended, and therefore that no such meaning is to be attached to the requirements of the constitution.
, It is to be borne in mind,that the question is purely one of power, unaffected by any considerations of expediency or propriety, and, as above intimated, that a reasonable doubt .of the invalidity of tlie statute, requires the court to sustain *249 it as fully and as unhesitatingly as if its validity wore not questioned. The repugnancy between its provisions and the constitution must he necessary and obvious. Cass v. Dillon, supra. A rational doubt upon the subject resolves the question at once in favor of its validity.
In view of this rule of interpretation, and of the aim -and purpose of the act, a majority of the court are not satisfied that it is a law of a general nature, requiring, as indispensable to its validity, a uniform operation throughout the state. It was designed to meet a special want in a county having within its limits a large and growing city, constantly increasing in population. That local conditions and necessities may exist in such cities, or in populous portions of the state, requiring regulations for the selection of jurors differing from those of other parts of the state less populous, and where such conditions do not exist, is very manifest. Such regulations are not, in our judgment, prohibited by the constitution.
If the act in question is void for want of operation throughout the state, it is clear to us that the more general .act of 1873 (70 Ohio L. 167) is void for the same reason. By this act the power to select the persons to be returned for jurors is conferred upon township trustees, the court determining the number and ordering the apportionment among the several townships. Power thus to select by township trustees in the townships has existed under various statutes since 1803.
There is no provision of that act requiring any apportionment to be made among, or selection from, the qualified ■electors of a city or village. Hence, the act, of 1873 does not operate throughout the state, uniformly or otherwise, as in some cities the office of township trustee does not. exist. Tt is, however, said that it was the purpose of the act to confer the power to make the selection of jurors upon, the judges of election in cities, as well as townships, and that the statute should he so construed. That this construction ■ought not to be adopted is readily made to appear. In the first place, one of the trustees does not act as a judge of the ■election, unless two opposite political parties are represented *250 on the board, by the result of the election, excepting cases' where all electors voted for, for trustees, are of the samepoli tical party (74 Ohio L. 19); and, in the second place, if either of the judges of election fails to attend at the time and place of holding the election, or is a candidate for a state or county office, the electors present are required to elect a suitable person or persons, having the proper qualifications, to act as judge or judges of the election. Substantially the same requirement prevails in city elections. The-councilman of the ward, and the elector of the opposite political party receiving at the next preceding April election, the highest number of votes for the office of councilman of those not elected thereto, constitute the judges of election, in such ward. It is also provided in the act of 1878, section-4, that whenever it shall appear that there is not a sufficient number of names of jurors remaining in the box for the.transaction of the business of the court, in any county, for the unexpired portion of the year, the judge of the court may cause such number as he may consider necessary to-be apportioned among the various townships of the county. Whereupon, the trustees,, upon being notified of the number apportioned to their respective townships, are required to-proceed immediately to select and transmit a list of the persons selected to the clerk of the court.
Thus it will be seen that the duty to make the selection and return of jurors is by said act enjoined on the trustees of townships in the most explicit language; and their duty to make such selection is as imperative when not •conducting the election as when they are. Ward trustees, are not mentioned in the act.
But there is abundant proof, outside the act, that ward 1 rustees are not authorized to perform such service. The second section of the act of May 8, 1852 (1 S. & C. 582), pertaining to elections, required the members of the city council in any city divided into wards to serve therein as judges of election, and to perform the duties of township trustees in like cases. Assuming that this act enjoined the duty, among others, of selecting and returning jurors, the- *251 duty long since ceased to exist, as by the amendatory act of April 12, 1870 (67 Ohio L. 47), that part of the act of 1852 imposing such duty was repealed. Besides, the fact that the act of 1852 required the members of the council conducting the election to perform the duty of making the-selection and return of jurors, shows that the general act relating to their selection and return by township trustees, was not regarded by the legislature as extending such duty to the trustees of wards. But if their want of power to make such selection is not sufficiently evident from the-foregoing, section 475 of the municipal code would seem to be perfectly decisive of the question!
That section provides, that “ whenever the corporate limits of any city or incorporated village become identical with any township, then and thereafter the office of township trustee, township treasurer, and township clerk, shall-be abolished and cease; and all the powers and duties of trustees of townships' conferred or prescribed by law shall vest in and be performed by the council, except as to binding out apprentices, and administering relief to the poor.”'
The act of May 7, 1872 (69 Ohio L. 23), preserves the corporate existence of such township for the sole purpose of electing justices of the peace and constables, evidently to meet the constitutional requirement that justices of the-peace shall be elected by townships. But for all other purposes the township organization in this class of cities and villages is abolished.
It thus appears that power to select jurors is not only not conferred upon the trustees of wTards, but in the class-of cities or villages named, the duty to make the selection and return is devolved on the city or village council; expressly excluding from the city or village the operation of the act of 1873. Hence, neither the trustees of townships nor trustees of wards are permitted to perform such duty in such cities or villages. Now, it may be remarked here, that it is just as competent for the legislature to impose the duty of making such selection on the clerk of the court, county auditor, and treasurer, as upon the city or village *252 •council; for, in either case, the effect woul’d be to exclude the operation of the act of 1873, from such cities and villages.
In view, therefore, of these various statutory provisions, there can be little doubt, that'this act is open to the same objection, as that urged against the act the operation of which is limited to the county of Cuyahoga; for it is as fatal to the validity of an act of a general nature, that its operation is excluded from one township or city, as if excluded from the greater portion of the state.
Holding, therefore, the Cuyahoga act to be one of a general nature, and consequently void, as being within the prohibition of the constitution, would inevitably result in overturning a regulation for the selection of jurors that has •existed to the satisfaction of the people of the state for three-quarters of a century.
Again, it is nowhere required by the constitution that the power to select jurors should be conferred, or the duty enjoined, on any public officer or officers, county or township, or on any particular class of individuals. The inviolability of the right of trial by jury is guaranteed, and the right of one accused of crime to a speedy public trial by an impartial jury. But the mode of its selection is left to legislative discretion and judgment. The power of the legislature to authorize the several courts of common pleas throughout the state to prescribe by rule the mode of selecting jurors for their respective courts will not be denied. And yet oiie court might direct its clerk to make such selection, another the sheriff, and another might enjoin the duty on some one else. In other words, the power, when exercised, and in its ultimate action upon the people, would'operate differently, and not uniformly, throughout the state. What the legislature may thus authorize to be done, I see no reason why it may not do hy direct action. If the court of common pleas of Cuyahoga county could bo authorized hy general legislation to devolve the duty of selecting jurors for that court on its clerk, and the county auditor and treasurer, it is difficult to see why the *253 legislature may not by direct enactment designate the same-persons to perform such service.
At the first session of the legislature after the adoption of the present constitution, a local act was passed regulating the manner in which grand and petit jurors should be drawn and summoned in Hamilton county. 50 Ohio L. (Local Acts) 9. The selection was to be made by the township and ward trustees. I am not aware that the validity of this act was ever questioned. Its validity can be supported only upon the theory that it is not a law of a general nature. Any reasoning that undertakes to draw a distinction between this act and the one pertaining to Cuyahoga county, in its relation to the constitution, is necessarily fallacious. They are of precisely the same nature,, and both are limited in their operation.
Eor overruling the motion for a new trial on the ground first above stated, the j udgment is reversed, and a new trial ordered.,
: Okey, J.
I am unwilling to say that in a capital case, on the facts disclosed in the record as to the juror Stephenson, a court in this state is vested with discretion to refuse-a motion for a newT trial; and, therefore, I concur in the reversal of the judgment. But that is not the only or principal ground upon which the judgment ought to be reversed. I dissent from the opinion of the majority of the court that the act of 1877, known as the Cuyahoga county jury law (74 Ohio L. 218), is a valid enactment. In my judgment that statute is unconstitutional. In saying so, I am not unmindful of the rule that in ease of doubt as to its constitutionality, an act ought to be upheld. That doubt, however, must not be one arising from a hasty or imperfect examination of the question; nor-must it be one created in the endeavor to find for words in the constitution, in themselves perfectly plain and unambiguous, some occult or abstruse meaning. The doubt, in other words, must be reasonable and not artificial. As a careful consideration of the subject has left with me no such reasonable doubt, and as the question is important,: *254 the reason for the belief' that the act in question is void may be here properly stated.
’While there is difference of opinion concerning the origin •of trial by jury, the principle of that mode of trial has certainly existed from the time England ‘first had a national •existence; “ and we shall find it still earlier in the tribunals •of the Germans, the Danes, and the Normans; that is to .say, among three of the four elements of our race.” -Creasy’s Eng. Const. 188; 2 De Lolme (by Stephens) on the Eng. Cons., book. 1, chap. 13.; Stuart’s Eng. Const, pt. 4, ■§ 4; 1 Reeve’s His. Eng. L. 84; 2 lb. 3; 3 lb. 103; 3 ¿Stephens’ Com. 587; Proffatt on Jury Trial, § 24; 11 Am. L. Rev. 24-50. See, however, Forsyth on Trial by Jury, § 109. It is the same right recognized in magna charla (Creasy, 202), existing in substantially its present form for •several centuries, guaranteed in the ordinance of 1787, and .reasserted in our constitutions. And the words of the constitution are not merely the assertion of a general right to bo tried before persons selected for the purpose. “ The right of the accused to an impartial jury can not be ¿abridged. To secure this right, it is necessary that the body -of triers should be composed of men indifferent between the parties, and otherwise capable of discharging their duties as jurors.” Cooper v. The State, 16 Ohio St. 328; 23 Ib. 551; 29 Ib. 186. “ The number must be twelve; they •must be impartially selected, and must unanimously concur in the guilt of the accused, before a conviction can be had.” Work v. The State, 2 Ohio St. 296-304. “ Any act of the ■legislature providing for the trial otherwise than by a common-law jury, composed of twelve men, would be uncon.stitutional; and any act requiring or authorizing such trial by a jury, partial and biased against either party, would be -a violation of one of the essential elements of the jury referred to in, and secured by, the constitution.” Stokes v. The People, 53 N. Y. 16A-172. And see, especially, The State v. McClear, 11 Nev. 39-69, and the instructive opinion •of Ranney, J., in Work’s case.
In England the jury has, immemorially, been selected by 'the sheriff. “ Let us now pause- awhile, and observe with *255 ;Sir Matthew Hale (His. 0. L. chap. 12), in these first preparatory stages of the trial, how admirably this constitution is adapted and framed for the investigation of truth, beyond any other method of trial in the world. Eor, first, the person returning the jurors is a man of some fortune and consequence, that so he may be not only the less tempted to commit willful errors, but, likewise, be responsible for the faults of either himself or his officers; and he ■'is also bound, by the obligations of an oath, faithfully to execute his duty.” 3 Bl. Com. 355; 3 Stephens’ Com. 593.
Mr. Proffatt says that, so careful have the people of this ■country been in framing laws to secure the impartial selection of juries, that they have been unwilling to intrust to any officer “ the power and discretion given to the sheriff in England.” Jury Trial, § 127. The mode in no two •states is precisely the same, but in several instances it is .substantially the same. The states may be grouped as follows : In the New England States, the selection is made by their town officers. Our own mode is similar. In New York, California, Wisconsin, and West Virginia, supervisors 'make the selection, and in Delaware, Virginia, North Carolina, Nevada, and Maryland, it is done by the courts. Commissioners specially appointed make the selection in Arkansas, Florida, Illinois, Kansas, Kentucky, Minnesota, Nebraska, and Pennsylvania; while certain county officers make the selection in Alabama, Georgia, and Indiana.
Notwithstanding this diversity in the mode of making the ■selection, the laws upon the subject have, in general, been remarkable for their stability, and there has been as complete uniformity in requiring that the selection shall be made by Impartial men, as that the persons selected shall be impartial, •or that the number shall be twelve; and any departure, by the persons making the selection, from the established rule on the ■subject, has always afforded ground of objection. The English rule, as stated by Mr. Chitty, is incorporated, as follows, into the work of Proffatt on Jury Trial, where the authorities are collected: “ If the sheriff be the actual prosecutor of the party aggrieved, the array may be challenged, though no objection can be taken in arrest of judgment. *256 So, if the sheriff be of actual affinity to either of the parties, and the relationship be existing at the time of the return ; if he return any individual at the request of the-prosecutor or the defendant, or any person whom he be-, lieves to be more favorable to one side than to the other; if an action of battery be depending between the sheriff and the defendant, or if the latter have an action of debt against the former; if the sheriff, or his bailiff who makes the return, is under the distress of-the party indicting or indicted, of has any pecuniary interest in the event, or is counsel, attorney, servant, or arbitrator in the same cause.” § 150. In all these cases, the array may be challenged. And, in this country, the same care is observed to secure absolute impartiality in the persons making the selection.
In pursuance of the provisions in the constitution of November 29, 1802, which ordained that “ the right of trial by jury shall be inviolate,” the general assembly, on April 15, 1803, passed an act relating to practice in the courts, and inserted therein full provisions as to the manner of obtaining juries. 1 Chase, 358. That act was modified as to those provisions, and others, and was re-enacted in 1805 (1 Chase, 452, §§ 18, 19), and again in 1810. 1 Chase, 719, §§ 114-127. In 1816, the sections-relating to juries were first separated from the practice act, and, with additional provisions, incorporated into a statute confined to that subject (2 Chase, 983); and the same statute was re-enacted, with modifications and additions, in 1824 (2 Chase, 1289); in 1831 (3 Chase, 1705; 3 Curwen, 2359); and again in 1873 (70 Ohio L. 167); the latter statute being still in force, though its repeal and substantial re-enactment are provided for, to take effect September 1, 1878. 75 Ohio L. 636-801, par. 153.
While the law as originally enacted in 1803, has been subjected to changes, its important features have remained substantially the same to the present day, a period of three-quarters of a century. The jurors are still apportioned to the townships, required to be electors and judicious persons, and are selected by the trustees of the townships; their *257 names are still returned to the clerk of the court, placed in a box, and drawn therefrom by lot; and the course has. always been for the clerk to issue a venire, which is served by the sheriff', and the sheriff, when required, calls bystanders.
True, since the enactment of the original act, many municipal corporations have been divided into wards, and these have been made election districts; but it is too clear for argument that this has, in no manner, affected the character of the provisions under consideration as general laws.. The power was delegated to the township officers, not in their character of trustees, but as judges of elections, for the selection of jurors is required to be made at the October election, when the persons to be chosen are fresh in the memory of the officers of election, indeed, while. their names are before those officers in the poll-books. And when councilmen were made judges of elections in the-■wards, they became, ex officio, clothed with authority tose] ect the ward’s proportion of jurors, without any change, in terms, of the provisions of the jury law. The principiéis perfectly familiar. Thus, the act of 1840, relating to-executors and administrators, remained in force until 1878.. 75 Ohio L. 854, 963. In terms, it required the “associate judges” to perform various duties; but as the office was-abolished by the constitution of 1851, and its duties devolved on the probate courts and courts of common pleas, the words, associate judge, were read, “probate court,” or “ court of common pleas,” as the ease might be. Beside, the election law of 1852 (50 Ohio L. 312; 3 Curwen, 1920)-provided, in terms, not only that the members of the council should serve as judges of elections, but that they should “ perform the duties required of township trustees in like-cases.” So it is under other statutes, and finally under the jury law of 1878. 75 Ohio L. 636. And that is in accordance with the uniform practice ever since wards became election districts, and no one has ever doubted the propriety -of that practice. Section 475 of the municipal code of 1869* *258 lhaf$ not the slightest bearing against the general nature of ■this legislation.
That the statutory provisions on the subject of jurors "have, ever since their enactment in 1803, constituted a general law, has never been doubted by any one. Nor was there any room for doubt. They applied to every part of ■the state, and to the whole people, and they operated on .all alike. But it is said that the act of 1873, and those which preceded it, though general laws, though enactments to render available rights which have been guaranteed for •centuries, are not laws of a general nature, within the meaning of the present constitution (art. 2, § 26), which -ordains that “all laws of a general nature shall have a uniform operation throughout the state.” Satisfied that ■'the position is untenable, I would be content to rest the ■whole argument on the proposition that the act of 1873 is .-a law of a general nature, and hence that the Cuyahoga ■ county jury law is unconstitutional. The question arises ■in the way which I will uow state.
The jury impaneled for the trial having been selected in acccordance with the Cuyahoga county law, the plaintiff in error moved, by his counsel, to quash the venire, ■on the ground, among others, that the act is unconstitutional ; but the motion was overruled, and he exeepffed. The plaintiff in error having been convicted, the questiou ¡as to the validity of the act is directly presented.
The Cuyahoga county law was passed May 7, 1877 (74 ■Ohio L. 218). By its terms, it only extends to counties which had, “ at the last federal ceusus, a population of more than one hundred thousand and less than two hundred "thousand inhabitants.” That this circumlocution was an idle form is quite certain. The court will take judicial notice that these words could ouly embrace Cuyahoga ■county, and hence the act must be limited to that county. The State v. Covington, 29 Ohio St. 102; Devine v. Comm’rs of Cook Co., 84 Ill. 590.
The most prominent difference between the two acts is, ■that under the general law, the jurors are selected by the *259 •township trustees and corresponding officers in the wards, while under the Cuyahoga county law, the selection is made by the clerk, treasurer, and auditor — county officers.
No part of the act of 1878 is in terms repealed by the ■Cuyahoga county law; but it is perfectly clear that if the latter act is valid, it operates as a repeal of the act of 1878, .so far as to withdraw Cuyahoga county from its operation; ■for, manifestly, the intention was that the Cuyahoga counfy law should afford the only means of obtaining a jury in that ■county. To provide that both the grand and petit juries for that county shall be drawn from the names selected by the clerk, treasurer, and auditor, is, in effect, to provide that they shall not be otherwise obtained. A subsequent statute, evidently intended as a substitute, as to a particular locality, for a former statute, general in terms, operates as a repeal of the former statute as to such locality, if article 2, •section 26, be not violated. But, if the act of 1873, is a law of a general nature, then it can not constitutionally be limited in its operation ; it must be in force, if at all, throughout the whole state; and hence, the Cuyahoga county law, which would limit its operation to less than the whole state, would be void.
As presenting the view most satisfactory to myself, I - will discuss the constitutionality of the Cuyahoga county law mainly by considering its' effect on the act of 1873, and the nature of that act. But that is not the only view from which it may be considered. The Cuyahoga county law furnishes a complete jury system in itself; it is, indeed, =a substitute for the act of 1873, and every part of it; its nature is as general as the act of 1873 ; but the act is limited to Cuyahoga county. The same objection may, therefore, bo made to it for its local application that may be urged ¡against it as excluding Cuyahoga county from the act of 1873. Hence, the uneoustitutionality of the Cuyahoga •county law may be placed on two grounds; first, it is an attempt to exclude Cuyahoga county from the act of 1873, which is a general law, whereby the act of 1873 would be rendered incompatible with article 2, section 26 of the con *260 stitution ; secondly, its nature is general, and, being an act confined to Cuyahoga county, it is in conflict with the same section of the constitution.
To hold that the Cuyahoga county law is not one of a general nature, simply because it is by its terms confined toCuyahoga county — because it applies to all intended to be affected by it — is to affirm that the provision under consideration was inserted in the constitution for no purpose, and cous-ists of words wholly without meaning. Such a construction would enable the legislature to pass a local or special law for any county on any subject. The statement of the proposition is a refutation of it; and we must seek for some ground based on reason, and not on a mere quibble, why the apparent conflict between the Cuyahoga county law and the constitution is not- real. Let us consider whether such satisfactory reason may be found.
By the first section of the first article of the constitution of 1802, it was ordained, that “ the legislative authority of this state shall be vested in a general assembly.” This, it has been said, clothed that body with all power which in its nature is legislative, except so far as its power was qualified in other parts of the same instrument, or its exercise restrained by the constitution of the United States. “While I believe that theory of the constitution is erroneous, and that the true doctrine is that the legislature, like other departments of the government, exercises only delegated power, yet, the power delegated to the general assembly is undeniably broad. There was nothing in the constitution of 1802 which required that laws of a general nature should operate throughout the whole state. Hence, a law confined in its operation to one county, and providing that an offense committed therein should be punishable, though it might not be punishable if committed elsewhere, or an act making an offense punishable with greater or less severity in one county than in others, was perfectly valid under that constitution. Allbyer v. The State, 10 Ohio St. 588. So, an act in relation to juries, or, indeed, on any other subject, it matters not how general the nature of the law *261 might be, could be made applicable to a single county, without contravening any of the provisions of that instrument. Charters of corporations might also, under that constitution, be granted by special act.
The evils which existed in this and many other states, under such unlimited legislative power, are matters of history. The volume of local and special laws of this state for 1850, contained seven hundred and nine pages, and the annual volume of such laws had been for years nearly or quite as large. The volume of local and special laws passed at the last session of the general assembly held under the constitution of 1802, contained seven hundred and eighty-three pages. Nor was the principal evil found in the bulk of the legislation. As the names of members who voted for or against a law were rarely entered on the journal, and as there was little restraint on legislative power, except with respect to the judiciary system, where limitation was mischievous, it is not strange that acts which were crude, unequal, and unjust, found, sometimes, a place among our statutes. The evils, under such a state of the constitutional law, are strongly, yet truthfully, stated by the chief justice in the late case of Van Riper v. Parsons, 40 N. J. (L.) 1; and the greatest of these evils, log-rolling, has beeu graphically described by Justice Miller, of the Supreme Court of the United States. 18 Albany Law Jour. 407.
Perhaps these evils never existed to the same extent in this state as in some others; but it can not be denied that they were so great as to furnish with us, and in other states, the most efficient cause for calling a convention and adopting a new constitution. True, much that was objectionable in legislation related to corporations, both private and municipal, but the evil was not confined to legislation on •any particular subject.
The provisions of article 2, section 26, and others, were inserted in the present constitution, in the belief that the evils I have mentioned, which had become a matter of serious concern, would, for the future, be averted. And *262 there was much to encourage the hope that a great reformation had been achieved. The volume of local and special laws, which immediately proceeded the adoption of the constitution, numbered, as we have seen, seven hundred and eighty-three pages, while in the year following (1852), it was reduced to twenty-two pages, in 1858 to-eighteen pages, and in 1854 to eight pages; and an attempt to confer on the court of common pleas jurisdiction in certaiu counties which it did not possess in others, was followed by the decision of this court that the act in question was void.
In the case to which I have referred (Kelley v. The State, 6 Ohio St. 269), Scott, J., delivering the opinion of the-court, said: “"We have, then, in the constitution, first, a, general, unqualified, positive prohibition or limitatioir of legislative power, forbidding the giving of a partial operation to any law of a general nature, or, in its own affirmative terms, requiring that a uniform operation throughout the state shall be given to all laws of a general nature.. Without undertaking to discriminate nicely or define with-precision, it may be said that the character of a law, as-general or local, depends on the character of its subject matter. If that be of a general nature, existing throughout the state, in every county, a subject-matter in which all the citizens have a common interest, . . . then the-laws which relate to and regulate it are laws of a general-nature, and, by virtue of the prohibition referred to, must have a uniform operation throughout the state.”
This clear and comprehensive language has never been questioned in, or shaken by, any subsequent decision. It is,, in my judgment unanswerable; and taken in connection with the point determined, ought to be regarded as conclusive against the validity of the Cuyahoga county law. And, indeed, the reasons for sustaining the law under consideration in that case were far stronger than any reason I have heard for upholding this jury law. There might besóme ground for conferring on the court of common pleas, at the large commercial centers, jurisdiction some *263 what different from that which may be sufficient for the public necessities in the rural portions of the state; but no reason has been given why the mode of selecting .jurors-should not be the same throughout the state. It is not pretended that the township trustees and ward officers in Cuyahoga county are not as capable and conscientious as the like officers in other parts of the state, and I am not at liberty to imagine there is any substantial difference. As was well remarked by a distinguished statesman, “ our town officers, in the aggregate, are more important than congressmen and senators.” North Am. Rev., Nov. 1878, p. 367. Plain and unlearned, as they frequently are, they observe the requirements of their oaths as faithfully,-and discharge their duties as conscientiously and intelligently, as any other officers, county, state, or federal; and when it is found that we can no longer intrust the nomination of persons from whom our juries are selected to the officers who receive and count the ballots at all our elections, it will be time to seriously consider whether we should not abolish trial by jury and election by ballot. But even if the Cuyahoga county law could be regarded as providing the best possible mode of selecting juries, our conclusion ought to be the same, for the objection, that the subject-matter of both the acts under consideration is general, would remain wholly unanswered.
When we look more closely to the provisions of our present constitution, the conclusion that the Cuyahoga county law is unconstitutional is strengthened. It is declared in that constitution (art. 2, § 1), in nearly the same words as in the former constitution, that “the legislative power of this state shall be vested in a general assembly.” hi o doubt, what I have said as to the scope of the corresponding provision in the constitution of 1802, applies here. But the present, unlike the former constitution, contains numerous express limitations on legislative power. While Mr. Cooley is unwilling to admit that any of these limitations can be regarded as directory [Con. Dim. (4 ed.), 94-99], it may, perhaps, be deemed settled that in this state they must *264 be divided into two classes, one class directory, and the other mandatory. Thus, the provisions as to the number of times a bill shall be read; that no bill shall contain more than one subject, which shall be clearly expressed in its title ; and that if a law is amended, the old section or sections shall be expressly repealed, are among those which are held to be merely directory. Miller v. The State, 3 Ohio St. 475 ; Pim v. Nicholson, 6 Ohio St. 176 ; Lehman v. McBride, 15 Ohio St. 573; The State v. Covington, 29 Ohio St. 102. On the other hand, the provisions that the general assembly shall, except in certain specified cases, exercise no appointing power; that the legislature shall not authorize a county to become a stockholder in, raise money for, or loan its credit to, a corporation; that money shall not be paid out of the treasury, without consent of two-thirds of the members of each house, on any claim the subject-matter of which shall not have been provided for by pre-existing law, and other provisions, have been held to be mandatory. State v. Kennon, 7 Ohio St. 546 ; Taylor v. Comm’rs of Ross Co., 23 Ohio St. 22 ; Fordyce v. Godman, 20 Ohio St. 1; The State v. Mitchell, 31 Ohio St. 592; The State v. Williams, ante, 218.
The distinction seems to be, that those provisions relating to the mere forms to be observed in the passage of a bill, or in the structure of a bill, are, as a general rule, directory merely; while provisions relating to the number required to pass a bill, or the effect and operation of a bill when passed, are usually regarded as mandatory.
With respect to the clause under consideration, that all laws of a general nature shall have a uniform operation throughout the state, we are left in no uncertainty. In Kelly v. The State, supra, this court held, as we have already seen, that it was mandatory, and that is in accordance with the views expressed in Cass v. Dillon, 2 Ohio St. 607-617; Allbyer v. The State, 10 Ohio St. 588; Ex parte Van Hagan, 25 Ohio St. 426-431; Durkee v. Janesville, 26 Wis. 697; Ruffner v. Comm’rs of Hamilton Co., 1 Disney, 196-203 ; Ex parte Pritz, Davis v. Woolnough, 9 Iowa, 30, 104; McGregor *265 v. Baylies, 19 Iowa, 43 ; Van Riper v. Parsons, Pell v. Newark, Bingham v. Camden, 40 N. J. (L.), 1, 71, 156 ; Darling v. Rogers, 7 Kansas, 592 ; Robinson v. Perry, 17 Kansas, 248; 8 Nevada, 337, 338; Cooley’s Con. Dim. (4 ed.), 57.
In Indiana, and some other states, the constitution contains a provision that upon certain enumerated subjects no special law shall be passed, nor shall such law be passed in any case where it is practicable to secure the desired object by a general law. In The State v. Tucker, 46 Ind. 355, and. ■other cases, it was held that whether as to statutes with respect to which there was no mandatory constitutional provision, a general law could be made applicable, was a question for the legislature, and not the courts; and that •certainly seems reasonable, though it is said in New Jersey ■and Nevada, as it was formerly held in Indiana and Iowa, that the question even then is judicial. 40 N. J. (L.), 71 ; 8 Nevada, 337, 338. But there is no such provision in the constitution of this state. Here, there is the mandatory-provision that all laws of a general nature shall have a uniform operation throughout the state. Manifestly, in this case, as in all others, each branch of the legislature must, in the first instance, determine for itself whether it has constitutional power to pass the bill; but the power conferred on the General Assembly is legislative and not judicial, while that conferred upon the courts is judicial and not legislative, and it is quite clear that in the distribution of governmental powers it pertains to the courts to finally* determine as to the constitutionality of ail laws. That the ■question whether a law is of a general nature is no excep- ■ tion to this rule, abundantly appears in the cases cited in the last paragraph, and especially Kelley v. The State, where the point was necessarily decided.
Ruffner v. Comm’rs of Hamilton Co., 1 Disney, 39 ; s. c., Ib. 196, is supposed to be an important case on the question ■under consideration. But the point decided was reudere d unimportant by a subsequent decision of this court. The act under consideration in Ruffner v. Comm’rs of Hamilton *266 (Jo. was one prescribing the mode to be observed by the commissioners of Hamilton county in making contracts, and-was passed before the adoption of the present constitution. Whether it was of a local or general nature was, therefore, an unimportant question, as it was decided in Allbyer v. The State, supra, that the provisions of article 2, section 26, were only prospective, and that local and special laws, though of a general nature, in force when the constitution was adopted, remained in force. Besides, the court, in Ruffner v. Gomm’rs, was no doubt correct in saying that a law of the character there under consideration was not one of a general nature. The same principle is recognized in Crickettv. The State, 18 Ohio St. 9. But the learned judge who-delivered the opinion at special term, in Ruffner v. Comm’rs, said that “ no new limitation was introduced into the new constitution by the clause alluded to (art. 2, § 26), that did not attach, by fair legal construction, to the old.” P. 42. In this respect he was clearly in error. Kelley v. The State, The opinion in general term, however, was carefully prepared, and, wheu considered as a whole, will be found to support the view for which I contend. See pp. 201-206.
A claim has also been made, based on some remarks of Thurman, J"., in Cass v. Dillon, 2 Ohio St. 607-617, as to-the origin of the constitutional provision in question, that it simply prohibits local legislation for the punishment of crimes. Aside from the fact that the learned judge puts-no such limitation on the clause, but expressly says, “ how ‘far it reaches, it is not necessary now to decide,” it is contrary to well-settled rules to place any such limitation on the provision. Particular cases or instances lead to the-adoption of general rules or principles. Many of the general rules of law are thus deduced from the decision of particular cases. But when particular instances lead to the adoption of a general rule, in the form of a legislative- or constitutional provision, the rule is to be interpreted from the language employed in its enunciation, and that 'language, when clear and comprehensive, is not to be limited in view of the particular instances which may be sup *267 posed to have led to its adoption. Goshorn v. Purcell, 11 Ohio St. 641-649. Besides, Kelley v. The State is a direct authority for saying ño such limitation can be placed on the provision.
Much reliance has also been placed on the California ■cases. It is said the provision in our constitution as to laws of a general nature, was taken from the constitution of that state, where it received a construction which w ould sustain this law. But where the constitutional provisions- ■ of two states are in some respects alike, it is a very common error to suppose that a construction given to a provision in one state necessarily throws light on the corresponding provision in the constitution of the other state.. When regard is had to the context, the difference in language, and other circumstances, the decisions in one state may be a very unsafe guide in the other. The applicability of that rule in this connection is quite plain :
1. At the time our constitution was adopted, no construction had been placed on the clause in the California constitution; and hence the origin of the clause is of no importance. Our present constitution owes its vitality to the votes of the people, the great body of whom relied, and had a right to rely, solely on its words. 3 Ohio St-46.
2. The clause irrthe California constitution is not found, as here, in the article relating to the legislative department,, where the limitations expressly addressed to the legislature are placed, but it is in the declaration of rights, along with such general provisions as these : All men are by nature-free and independent. All political power is inherent in the people. Every citizen may freely speak his sentiments-on all subjects. “ Sec. 10. The people shall have the fight freely to assemble together, to consult for the common good, to instruct their representatives, and to petition the legislature for the redress of grievances. See. 11. All laws of a general nature shall have a uniform operation. Sec. 12. The military shall be subordinate to the civil power.” In this connection, and in these words, the provision is *268 simply a declaration against unequal legislation, and was intended to prohibit such statutes as that under consideration in Atkinson, etc., R. Co. v. Baty, 6 Neb. 37, where it was held that an act which gives to the owner of stock •double its value when it is accidentally killed by a railroad company, on its track, was wholly void.
3. The provision in our constitution contains the words, “ throughout the state,” which are not in the California constitution. These words were inserted in our constitution on the motion of Mr. Humph rey ville. 2 Debates, 579. It is a serious error to say they are of no importance. There is a general presumption that every word in a statute was inserted for some purpose (2 Ohio St. 402 ; 8 Ohio St. ■567) ; and this presumption has much greater force when .applied to constitutional provisions, which are framed with more deliberation, and are ordinarily more concise. A member of a sentence, consisting, as here, of several words, is rarely, if ever, held to be without significance in a constitution. Here it is apparent the words mentioned are of the greatest importance. There was, as we have seen, in •our former constitution, nothing to prevent the passage of ■a law, general in its nature, but confined in its operation to one county. Allbyer v. The State, supra. So it is in. California. If a law, general in its nature, has a uniform operation in the city or county, or to the class or subject to which it has been applied, the constitution of that state is complied with. As in our former constitution, there is nothing in the constitution of California which requires that any act shall have a uniform operation throughout the ■state ; at least, practically, the courts of that state so construe the constitution.
4. Kelley v. The State shows that the courts of this state construe the provision in our constitution in direct opposition to the construction given to the clause in the California constitution, in which state it is, in effect, regarded as directory merely.
The remarks as to the California cases are applicable with as much or greater force to the Indiana, Iowa, and *269 other cases supposed to support this statute; but I will not take time and space particularly to notice them.
What, then, is a law of a general nature, which must have a uniform operation throughout the state? A law regulating the compensation of a county officer is not such a law, for the difference in the counties as to wealth and population, and consequently the official duties to be performed, are very great, and the framers of the constitution could not have intended a result so unjust as that the same-compensation should be paid throughout the state. Such a law would be as unreasonable as one providing that each county should have the same number.of jurors every year,, or that terms of court should be held the same length of time in each county, or that the time of holding court, which is of local concern, should not be changed in any county. The State v. The Judges, 21 Ohio St. 1; Cricket v. The State, 18 Ohio St. 9. It was properly said in these-cases that there is nothing in the constitution to prevent appropriate local legislation. The best discussion of the question as to what constitutes a local law will be found in The People v. Supervisors, 43 N. Y. 10. And see 68 N. Y. 381.
Again, in order to constitute a law one of a general nature, with uniform operation throughout the state, it is not essential that its operation should be universal, applying directly to every person or thing in the state. A law applying to all electors of this state in the military service of the United States, was held to be a law of a general nature. Lehman v. McBride, 15 Ohio St. 573. The same view was taken of the act of April 4, 1863 (S. & S. 131), relating to all railroads which had been sold. The-State v. Sherman, 22 Ohio St. 411-429. But the constitutionality of such a jury law is not necessarily established when we find provisions in it which are not of a general nature. Thus, the number of jurors for a county might be fixed by a local law; but such a jury law is invalid, where, as in this case, it contains provisions of a general nature, which can not be separated from the act without destroying it.
Moreover, under the power to organize cities and vil *270 lages (const, art. 13, §. 6), the general assembly is authorized to classify municipal corporations, and an act relating to any such class may be one of a general nature. To what extent such classification may be carried it is unnecessary to inquire, as nothing of the sort was attempted, or ivas possible, with respect to the Cuyahoga county law. The leading cases on the subject are the following: Matter of N. Y. Elevated R. R. Co., 70 N. Y. 327 ; Wheeler v. Philadelphia, 77 Pa. 338 ; Van Piper v. Parsons, The State v. Parsons, 40 N. J. (L.) 1-6, 123; Chicago, etc., R. Co. v. Iowa, 94 U. S. 155 ; The People v. Klokke, 70 Ill. 388; Devine v. Comm'rs of Cook Co., supra; The State v. Covington, supra; The States. Mitchell, supra.
The answer to the question, then, what is a law of a general nature, is, it seems to me, as applied to many laws, very plain. Bearing in mind the instances just mentioned, in which acts have been held to be local in their nature, and those in which their nature has been held to be general, we will be in a situation to understand the force of the ■definition in Kelley v. The State, already mentioned. “ The ■character of a law as general or special,” said Scott, J., “ depends on the character of its subject-matter. If that be of a geueral nature, existing throughout the state, in every -county, a subject-matter in which all the citizens have a common interest, . . . then the laws which relate to .and regulate it are laws of a general nature.” And it is vain to bi’ing forward, either in support of, or opposition ■to, this clear definition, the decisions in other states, made under constitutions which are materially different from our own.- Nor can there be, ordinarily, serious difficulty in ascertaining the character of any law, whether general -or special, by the application of that rule.
Recurring to the evils of this legislation, we can not doubt that such enactments will not only have a tendency to render this limitation on legislative power (art. 2, § 26) directory ■merely, in which case “it is very likely to be treated as if it ■was devoid even of moral obligation” (Cooley’s Const. L. 183), but the consequences which may flow directly from *271 acts of this character may be most serious. The constitution confers no jurisdiction on the court of common pleas, but it is capable of receiving jurisdiction by statute. Although, as we have seen in Kelley v. The State, statutes relating to the jurisdiction of that court are laws of a general nature, still they may be changed by laws operating throughout the state, not only as to matters where the right of action has accrued, but even as to suits actually pending, whether civil or criminal (Stevens v. The State, 3 Ohio St. 453; 25 Ohio St. 590; 27 Ohio St. 22); and, of course, the same •thing may be done with respect to laws relating to juries. Stokes v. The People, 53 N. Y. 146; Warner v. Balt. & O. R. R. Co., 31 Ohio St. 265. It follows, that while it is impossible to change the laws defining crimes or punishments, so as to affect one already charged with an offense, for the reason that such laws can not have a retroactive operation, it is in the power of the legislature to enact a liiw providing that one man shall select the grand and petit juries even for cases in which the offenses have already been committed. "Who will say that, in times of great public excitement, this effectual mode of dealing with persons obnoxious' to those in power may not be resorted to ? And the danger is tenfold greater that such a law will be passed if it can be made local.
The evil of clothing one man with such power is thus ■alluded to by Mr. Proffatt: “ The English practice allowed the officer summoning a jury a large, and, as we think, dangerous degree of discretion, as to the selection of the persons who formed the jury. This gave rise to the very •common and grievous complaint so frequently made in judicial proceedings of a packed jury, which under the •system there was possible, and the evils and dangers of which have been so forcibly pointed out by writers, especially "by Bentham, in his Art of Packing Juries.” Jury Trial, ■§ H5.
As further proof that apprehensions of that sort are well founded, we will presently see that in several states the *272 danger has been considered so great as to call for constitutional amendments.
Is it not of far greater importance, for the reasons stated, that acts relating to juries should be general than that those relating to crimes should operate throughout the state? Indeed, there might be reason for punishing some acts ■committed in large cities, .and permitting the same things done in the rural portions of the state to go unpunished; and, possibly, different degrees of punishment, in different parts of the state, for the commission of crimes of a like character, might not be wholly without reason. But what reason has been or can be given why the same class of officers should not select jurors in all parts of the state?
It is said, however, that the liability to abuse does not prove the non-existence of the power to pass such an act. This is no doubt true. But where a provision is inserted in a constitution to remedy an admitted evil, we may properly inquire what abuses existed before the provision was made, and what may be done under a particular construction of the provision, in order, if it may be fairly done, to “ show the scope of its legitimate operation.” 18 Ohio St. 840.
To remove all danger from local legislation on subjects so vital to the life, liberty, and property of the citizen, it is provided in the late amendment to the constitution of New Jersey that tbe legislature shall pass no private, local, or special act changing the law of descent or the venue of a cause, or the law with respect to the punishment of crime, or the “ selecting, drawing, summoning, or impaneling grand or petit jurors.” Substantially the same thing has been done in New York, Pennsylvania, Illinois, Indiana, Florida, West Virginia, Oregon, Nevada, and doubtless in other states. ■ If a statute relating to the selection of juries is not an act of a general nature, but one which may properly be made local, is it not strange that states with the large experience of New Jersey, New York, and others, should insert, in their organic laws a provision that the legislature should never pass a local law on that subject, or relating to descents, crimes, etc.? In New Jersey *273 it was said that, as to the matters enumerated, “ the object' was to exterminate, root and branch, special and local legislation.” 40 N. J. (L.), 5. But in reality we have gone much further in Ohio. Not content with an enumeration, as in the above-mentioned states, which vests in the general assembly a discretion as to the subjects of legislation not enumerated, we have, in clear, unambiguous, mandatory terms, declared, not that some, but that all laws-of a general nature shall have a uniform operation throughout the state.
Other objections to this legislation than those already enumerated will be found to exist. Thus it will appear from a comparison of section 11 of the general law,, as amended in 1876 (73 Ohio L. 20), with the Cuyahoga, county law (74 Ohio L. 219, 220), that the causes of challenge are not precisely the same under the two statutes. While the difference is not very great, a principle which ■will authorize any difference in this respect will permit one-rule in Hamilton, another in Cuyahoga, and still another in Eranklin, and justify laws wholly different as to the-qualifications of jurors. But I am unwilling to discuss the-law in this view, for that defect might be remedied. I am content to place my objections on the grounds already stated, as to which the infirmity is incurable.
We are told that the same thing done directly by this-law might be done indirectly by conferring on the courts of common pleas throughout the state power to determine in what manner juries may be selected; and that no reason exists why the legislature may not do directly what it can. do indirectly. Whether the legislature could delegate this-power to the conrts, I will not stop .to inquire. The admission that it could, proves nothing in support of this statute. The supposed law would be one of a general nature, and have uniform operation throughout the state, and so the constitutional provision would be complied with. But it is not true that the legislature can always do directly what may be accomplished indirectly. It may establish courts,, *274 but it can not render judgments; and it may accomplish many things by general laws which it is prohibited from ■doing by special or local legislation.
Other matters of minor importance will be disposed of briefly. It. is said the first general assembly under the present constitution passed a local act for Hamilton county on the subject of juries. That is true. 50 Ohio L. L. 9. But that act was purely local in its nature. It was passed to meet a change in the Judicial system iu that county, occa.■sioned by the creation of a criminal court, and the selection of the jurors was left with the trustees and ward officers, as under the general law. It is a proposition' too plain for argument that it lends no support to the Cuyahoga county law. The same remarks apply in general to two or three other statutes of like character. Besides, if these laws had not been of a local nature, as remarked by ■ the court in The People v. Allen, 42 N. Y. 378-384, “no •length of usage can enlarge legislative power, and a wise •constitutional provision should not be broken down by frequent violations.”
The consequences of holding this act void have also been radvei'ted to. But a verdict rendered by a jury selected un■der the act can not be successfully assailed, however invalid the law may be, unless the objection was made before the jury was impaneled.
I yield to no one in respect for the opinion of the majority in this case, but that can not. control my own deliberate judgment. To reconcile the Cuyahoga county law with Kelley v. The State or the constitution is, in my judgment, a-task which will never be performed; and, although the direct mischief from permitting different modes of selecting juries throughout the state is serious, it is small •compared with the injury occasioned in another way. ‘Though not intended to have such effect, it is feared the ■decision sustaining this law will be regarded as licensing a return to the ways of log-rolling, which is a road, as expedience shows, leading to evil, and that continually. We have seen that the constitutional provision which guaran *275 tees to one accused of crime, a trial by j ury, means something more than that he shall be tried by twelve men— something more than that these men shall be impartial — it requires that they shall be selected by impartial persons. That right has been regulated by statutory provisions so stable that they have remained in force, with the same distinguishing features, ever since the organization of the ■state government, and these wholesome provisions have "been uniformly extended to every county and to all the people. In this way it is demonstrated that the subject-matter of this law is general. It is admitted, by the majority, that under article 2, section 26, some laws must have an operation throughout the state. The effort to show the •cases in which that is required irresistibly leads the mind, as I think, away from the conclusion reached by the majority. The nature of no one of them is more general than the nature or subject-matter of these jury laws. I am aware that in a recent case (70 N. Y. 353), it was said: “ There may he ways for a legislature to circumvent a constitutional provision without violating it.” Possibly this law may be maintained on that theory. But the doctrine is fundamentally wrong, and I wholly dissent from it.
Gilmore, J., authorizes me to say that he concurs in this •dissenting opinion, and also concurs in reversing the judgment for error with respect to the juror Stephenson.